**Kevin T. GETHERS, a/k/a Kelvin Gethers, Appellant,**

v.

**UNITED STATES, Appellee.**

**Marcus L. GETHERS, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 93–CF–1482, 93–CF–1483.

District of Columbia Court of Appeals.

Argued March 7, 1996.*

Decided Oct. 31, 1996.

---

* Only the appeal of Marcus Gethers was argued; Kevin Gethers' appeal was submitted on the briefs.

M. Elizabeth Kent, Washington, DC, appointed by the court, for appellant Marcus Gethers.

Richard S. Stolker, Rockville, MD, appointed by the court, was on the brief for appellant Kevin Gethers.

Anjali Chaturvedi, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and James A. Meade, Assistant United States Attorneys, were on the brief, for appellee. Steven W. Pelak, Assistant United States Attorney, also entered an appearance for appellee.

Before FERREN, TERRY, and RUIZ, Associate Judges.

TERRY, Associate Judge:

Kevin Gethers and his nephew Marcus Gethers appeal from their convictions of various offenses related to the shooting of Tyrone Hollis. Kevin Gethers was convicted of first-degree burglary while armed,[1] assault with intent to kill while armed,[2] carrying a pistol without a license,[3] and possession of a firearm during a crime of violence.[4] Marcus Gethers was convicted of first-degree burglary while armed and possession of a firearm during a crime of violence.

On appeal, both appellants contend that the trial court erred when it barred defense counsel from suggesting to the jury that an unknown third party had committed the shooting. Kevin Gethers makes the additional claim that the trial court erred by not imposing sanctions against the government for discovery violations and by permitting the jury to hear gruesome and prejudicial testimony about the victim's wounds. Finally, Marcus Gethers claims that the evidence against him was insufficient to permit his case to go to the jury. We affirm the convictions of both appellants.

I

On September 25, 1992, at about 9:30 a.m., Tyrone Hollis answered a knock on the door of his basement apartment on 13th Street, N.E. Recognizing the voice of Kevin Gethers outside, Hollis started to open the door. Just as he unlocked it, however, Kevin and Marcus Gethers pushed it open and forced their way into the apartment.[5] Kevin Gethers pointed a gun at Hollis and yelled, "Where is the shit?" He then shot Hollis in his right side. Though wounded, Hollis fought with both men over the gun, and all three of them fell to the floor. After Marcus

1. D.C.Code §§ 22–1801(a), 22–3202 (1996).

2. D.C.Code §§ 22–501, 22–3202 (1996).

3. D.C.Code § 22–3204(a) (1996).

4. D.C.Code § 22–3204(b) (1996).

5. Hollis testified that it was not difficult to recognize Kevin because, even though the light was not turned on, there was sufficient light coming from outside to illuminate the apartment.

gained control of the gun, Hollis got a "real good look" at his face because he looked at Marcus as Marcus pointed the gun directly at him. Then, although he knew that his mother was not in the house,[6] Hollis yelled "Mom, run" to divert the attention of his attackers. As Kevin Gethers turned to run upstairs in search of Hollis' mother, Marcus Gethers shot Hollis again in the chest, and Hollis lost consciousness.

When Hollis came to, the intruders had fled. Hollis ran to a nearby store and asked the owners, John and Maria Watson, for help, although he had difficulty breathing and speaking because of his wounds. Hollis testified at trial that he identified both Kevin and Marcus Gethers as his attackers to the Watsons. John Watson testified, however, that Hollis had said only that he had been shot by Kevin Gethers, and Maria Watson stated that she wrote down only the name of Kevin Gethers when Hollis said who had shot him. Mr. Watson helped Hollis to a chair while his wife called for an ambulance. While they waited for the ambulance to arrive, Metropolitan Police Officer Anthony Wallace came into the store as he walked his regular neighborhood beat. Seeing the officer, Hollis exclaimed, "Wallace, Wallace, I know who shot me," and named Kevin Gethers as the shooter, adding, "I think I am going to die." The ambulance came almost immediately thereafter, and Hollis was taken to the MedStar Shock Trauma Unit at Washington Hospital Center.

Hollis' wounds were severe. Dr. Vikram K. Paul, the Associate Director of the Trauma Program at Washington Hospital Center, testified that Hollis was in cardiac and respiratory distress and in shock when he arrived in the emergency room. He had bullet wounds in his midsection, his lower left chest, the left side of his flank, and the upper left portion of his back. When emergency room personnel found that his left lung was not functioning, they rushed him into the operating room. Four hours of surgery revealed a substantial amount of bleeding in and around Hollis' heart, trauma to the heart, bullet holes in his stomach and his transverse colon, and damage to his rib cage and collar bone. To repair all of this damage and save Hollis' life, the surgeons made a "post mortem" incision, *i.e.*, an incision that ran from his collar bone to the bottom of his navel. As a result, Dr. Paul testified, Hollis suffered a great deal of pain.

On the day of the shooting, Detectives James Johnson and Gerald Rich went to the hospital to interview Hollis, but the doctors would not let them speak with him because he was in so much pain. When the detectives returned later that evening, Hollis was able to nod his head when Detective Johnson asked him if Kevin Gethers had shot him. Because of Hollis' extreme pain, a nurse asked the officers to stop questioning him, and they left.[7] The next day, September 26, Detective Rich went to the hospital to talk to Hollis, and again he identified the shooter as Kevin Gethers. His ability to speak was hampered by the tubes that had been placed in his mouth, so Hollis scribbled a note in Detective Rich's notebook indicating that a second person had taken part in the shooting.

On September 28 Detectives Rich and Johnson, along with Detective William White, returned once again to the hospital. Hollis was still in serious condition and in great pain, so that the detectives were able to interview him for only about five minutes. The detectives, however, had brought with them an array of photographs, and from that array Hollis picked out a picture of Kevin Gethers. Johnson testified that before they left, Hollis told them that "there was two people who was there and did the shooting." About a week after the shooting, while still in the hospital, Hollis told his mother that the second shooter was Marcus Gethers. She

6. Hollis lived in a basement apartment in his mother's home.

7. By coincidence, Hollis' mother, Elsie Hollis, worked in the catering department of the Washington Hospital Center. When she learned of her son's injuries, she went immediately to the intensive care unit and saw him there. Although he was unable to speak, he indicated by tracing letters on his bedsheet that "C.B." had shot him. "C.B." is Kevin Gethers' nickname.

testified at trial that she immediately reported this information to the police.

Detectives Johnson and Rich returned to Hollis' bedside on October 17 to ask him about several matters related to the shooting, including the identity of the second gunman. By this time, according to Johnson, Hollis was in much better physical condition and was able to speak freely. Hollis told the detectives that Marcus Gethers was the other man who had shot him. On October 20, just after Hollis was released from the hospital, Johnson and Rich again interviewed him and showed him another array of photographs. From this array Hollis identified Marcus Gethers as the second shooter.

At trial, counsel for Kevin Gethers began his opening statement by suggesting to the jury that an unnamed, unknown third party was responsible for the shooting. He stated that because Hollis, a drug dealer, sold "burn bags," *i.e.*, bags of white powder which contained no cocaine, on the street, he most likely had been gunned down by a disgruntled customer. After counsel had completed his statement, the court called defense counsel to the bench and informed him that "in the area of defending on a theory that somebody else committed a crime ... you must not only be able to present reliable evidence to show that that occurred, but you also must present evidence that clearly links an individual to the commission of that crime.... You can't just throw out some nebulous suggestion that [because] someone may have angered other people, they may have done something to him." Counsel conceded that he could not point to a particular person as the likely shooter ("I'm not trying to prove somebody else did it") and that he was only trying to attack Hollis' credibility. After further discussion, the court directed counsel to forego this defense if he could not identify a specific individual as the likely perpetrator:

[Y]ou can't just present evidence suggesting that some universe of people out there may have a motive or incentive to perpetrate a crime against someone, because of what that person allegedly did.... You've got to be able to not only present reliable and credible evidence on that issue, but you also have to present evidence that clearly links someone in particular to the commission of that crime.

\* \* \* \* \* \*

... You want to introduce evidence that he allegedly sold burn bags and that conceivably was the reason he got shot, because that conceivably would create a sufficient motive for someone to do that.

And I think it's all too tenuous ... because even if you show ... that he did these other things and you impeach him on it, and conceivably someone may have had a motive, that doesn't mean that those individuals carried out that motive. So you need more than just the potential that someone was angry and had an incentive to shoot him.

\* \* \* \* \* \*

... [E]ven if you show that other people threatened him because he sold burn bags, that alone would not be sufficient to show that those other people did, in fact, carry out their threats in reference to this shooting.... All you're [trying] to do is throw something out there for the jury to speculate about....

Kevin Gethers presented an alibi defense through the testimony of four witnesses, but he did not testify himself. His defense was that on the morning of the shooting he was in Emporia, Virginia, 178 miles from the District of Columbia. Marcus Gethers, who lived in the District of Columbia, testified that he was "not close" to his uncle Kevin. He said that on the date in question he was at home all morning; his sister and another uncle, James Hammond, corroborated this testimony. Marcus Gethers also said that, although he was acquainted with Tyrone Hollis, he had not seen him in the past ten years.

## II

▬ Both appellants contend that the trial court erred when it prevented defense

counsel from suggesting that an unknown third party or parties might have committed the shooting and from offering evidence to that effect. Generally speaking, a trial court ruling that certain evidence is not relevant or probative "is a highly discretionary decision which will be upset on appeal only upon a showing of 'grave abuse.'" *Mitchell v. United States,* 408 A.2d 1213, 1215 (D.C.1979) (citations omitted); *accord, e.g., United States v. Mosby,* 495 A.2d 304, 305 (D.C. 1985); *Randall v. United States,* 353 A.2d 12, 14 (D.C.1976); *Hardy v. United States,* 118 U.S.App. D.C. 253, 254, 335 F.2d 288, 289 (1964). We find no such abuse in this case.

The admissibility of evidence proffered by a criminal defendant that another person or persons committed the crime charged has long been a troublesome issue for this court. The source of our difficulty has been the fact that such evidence, though arguably admissible as part of a defendant's constitutional right to present a complete defense, carries with it the risk that the jury will be distracted from deciding the defendant's guilt or innocence and will instead focus on someone else's. To guard against such confusion, we previously instructed trial courts that "before evidence of the guilt of another can be deemed relevant and thereby admissible, the evidence must clearly link that other person to the commission of the crime." *Brown v. United States,* 409 A.2d 1093, 1097 (D.C. 1979) (citations omitted); *accord, Beale v. United States,* 465 A.2d 796, 803 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

Our recent decision in *Winfield v. United States,* 676 A.2d 1 (D.C.1996) (en banc), replaced the "clearly link" portion of the standard articulated in *Brown* and *Beale* with the test for determining relevance in general. "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977) (citation omitted), *cert. denied,* 435 U.S. 955, 98

S.Ct. 1586, 55 L.Ed.2d 806 (1978); *see also* FED.R.EVID. 401. The new formulation set forth in *Winfield* is that, to be admissible, evidence proffered by the defense must "tend to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense." *Johnson v. United States,* 552 A.2d 513, 516 (D.C.1989) (emphasis added), adopted in *Winfield,* 676 A.2d at 4. Although this case was tried before *Winfield* was decided, we need not consider whether *Winfield* should be applied retroactively here.[8] Rather, we conclude that under either the *Winfield* or the pre-*Winfield* standard, appellant cannot prevail.

■ Although *Winfield* relaxed somewhat the test for connecting the charged offense to an allegedly culpable third party, neither *Winfield* nor any of our prior decisions suggested that the third party could be a hypothetical person, *i.e.,* an unidentified, unknown person with only generic reasons for committing the crime. In *Winfield* we reaffirmed "the specific holding of *Beale*" that a defendant's proffer of evidence that someone else had an even stronger motive to kill the victim is "insufficient, without more," to meet the test for admissibility. *Winfield, supra,* 676 A.2d at 5 (citation omitted). A corollary of this holding is that a trial court need not even consider what "more" is required to meet either the *Winfield* or the now-supplanted *Beale* test when the defendant fails to claim that there actually is a person to whom the finger of suspicion may reasonably point. Such a person need not be identified by name (which may be unknown), but the defense must establish a reasonable possibility that an actual person other than the defendant committed the crime or was otherwise responsible for it, not just a hypothetical, unidentified person who may have had a motive. Thus, for example, in *Winfield* itself, the defendant sought to present evidence implicating a specific person, Edward Huff, as the murderer. Similarly, in *Freeland v. United States,* 631 A.2d 1186 (D.C.1993), the defendant, on trial

---

**8.** *But see Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

for the murder of his wife, proffered evidence that he and his wife had both been assaulted by unknown persons, and that they had killed his wife at the bidding of one William Hawthorne, whom Freeland had fingered in a previous murder. Even though the assailants were never identified, we held that "in the aggregate" the proffered evidence about Hawthorne met the *Beale* test and should have been admitted. *Id.* at 1189–1190.

In the case at bar, defense counsel sought only to suggest to the jury that a dissatisfied customer to whom Hollis had sold a burn bag might have shot him in retaliation. He made no showing or proffer that such a person, if he or she actually existed, was connected in any way to the shooting. We agree with the trial judge that counsel was merely trying to "throw something out there for the jury to speculate about." We hold that the defense proffer did not meet the "reasonable possibility" test of *Johnson,* adopted en banc in *Winfield,* and that the trial court therefore did not abuse its discretion in excluding the proffered evidence and in refusing to allow counsel to present this theory in his opening statement.

### III

■ Kevin Gethers claims that the government violated its discovery obligations under Super. Ct.Crim. R. 16 by denying him access to Hollis' medical records prior to trial. Claiming that his client had been prejudiced by the inability to review the records, Kevin Gethers' counsel asked the trial court to prohibit their use by the government and to impose appropriate sanctions. The prosecutor replied that, while he had not photocopied and forwarded Hollis' records because of the time and expense involved, he had informed defense counsel that he could examine the records in his office. Counsel never inspected the records as invited. Because defense counsel, despite the length of time that had elapsed since his discovery request, had not brought the asserted Rule 16 violation to the court's attention before trial, the court refused to exclude the evidence or to impose sanctions; however, it did order the prosecu-

tor to produce the records at trial and granted defense counsel time to inspect them. The record does not disclose any further request by defense counsel for additional time to review the documents.

Rule 16(a)(1)(D) requires the government, upon request by the defense, to permit inspection or copying of "any results or reports of physical or mental examinations" that are "material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial." In addition, Rule 16(d)(2) states in part:

> If at any time during the course of the proceedings it is brought to the attention of the Court that a party has failed to comply with this rule, the Court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other orders as it deems just under the circumstances.

■ The decision as to what sanctions, if any, to impose for a Rule 16 violation is committed to the discretion of the trial court. *E.g., Sheffield v. United States,* 397 A.2d 963 (D.C.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979); *Cotton v. United States,* 388 A.2d 865, 869 (D.C.1978). We have said that "the range of available sanctions is extremely broad, the only real limitation being that a sanction must be 'just under the circumstances.'" *Davis v. United States,* 623 A.2d 601, 605 (D.C.1993) (quoting from the rule). When "[t]he record supports the trial court's ruling that sanctions were unwarranted ... the trial court's failure to impose sanctions does not constitute an abuse of discretion." *Allen v. United States,* 649 A.2d 548, 554 (D.C.1994); *see Marshall v. United States,* 340 A.2d 805, 809–810 (D.C. 1975).

On the record before us, we are satisfied that the trial court did not abuse its discretion in refusing to impose sanctions on the government. Even though the parties disputed the accessibility of the records, the court was not asked to intervene in that

dispute until the second day of trial, after the jury was sworn. The court directed the prosecutor to furnish copies of the medical records to defense counsel, and later that same day counsel for Kevin Gethers said they had been provided to him. When he protested that they were too voluminous to review at that time, the court said it would take breaks in the trial so that counsel could "go through the records as thoroughly as possible so that [you] can use whatever information is in there." The next day, after counsel for Marcus Gethers said that she too needed more time to review the records, the court recessed the trial in mid-afternoon and did not resume until almost 11:30 the next morning. At that time neither counsel said that any additional time was needed to review the medical records. Given the admitted tardiness of counsel's request, the opportunity provided by the court to review the records once they were made available, the failure of either counsel to request any more time, and the fact that each defendant presented an alibi defense (to which the medical records were irrelevant), we can find no abuse of discretion in the court's failure to impose sanctions under Rule 16.

We also specifically reject Kevin Gethers' assertion that the prosecutor's failure to turn over the medical records in advance of trial amounted to misconduct. The prosecutor told the court that he had sent a letter to counsel inviting him to come to his office and inspect the records. Although counsel said he never received the letter, that does not mean that it was not sent; at worst, what we have here is a failure to communicate. There is no basis whatever in the record for an accusation of misconduct on the part of the prosecutor. *See McGrier v. United States,* 597 A.2d 36, 40 (D.C.1991) (claim of misconduct "should not be made without a very solid factual foundation").

IV

■ Kevin Gethers contends that the trial court abused its discretion in allowing Dr. Paul to testify about the grim particulars of Mr. Hollis' wounds and the medical procedures necessary to treat them. He complains here, as he did below, that the evidence had little probative value and resulted in significant prejudice. The trial court justified the admission of this evidence as probative of the assailants' intent to kill.

As we have said earlier in this opinion, a decision whether or not to admit relevant evidence is left to the sound discretion of the trial court. Appellant's argument is not that the doctor's testimony was irrelevant, but that it was too inflammatory to be admitted. This issue arises most often in cases involving photographs of victims or crime scenes, but it is a rare case in which such evidence is excluded on the ground that it is so prejudicial that it cannot properly be weighed by the jury. *See, e.g., Johnson v. United States,* 613 A.2d 888, 895 (D.C.1992) (upholding admission of photographs showing victim who had been burned with a hot iron before being raped); *Faunteroy v. United States,* 413 A.2d 1294, 1299 (D.C.1980) (upholding admission of photographs showing the emaciated body of a two-month-old child who had been killed through the neglect of his parents); *Pittman v. United States,* 375 A.2d 16 (D.C. 1977) (upholding admission of photographs of a murder victim lying dead on the floor). In the case before us, the challenged testimony does not even have the emotional impact of a bloody photograph. Dr. Paul testified as a medical expert, using medical terminology to describe Mr. Hollis' injuries and the treatment he received at the hospital. The trial court ruled that the doctor's testimony was relevant to prove appellant's intent to kill, an essential element of one of the charged offenses, and we see no error in that ruling. *See Allen v. United States,* 383 A.2d 363, 368 (D.C.1978) (evidence that one of three robbers shot victim in the neck at close range sufficient to prove intent to kill). Considering the cases in which we have repeatedly and consistently upheld the admission of gruesome photographs, we can find no abuse of discretion here in the admission of Dr. Paul's testimony.

V

■ Marcus Gethers argues, as he argued in the trial court, that the lapse of time

between the crime and Hollis' identification of him made the identification so untrustworthy that the evidence was insufficient to sustain his conviction. He also claims that Hollis' identification was suspect because he had little opportunity to view his assailants as he struggled with them. The trial court rejected these arguments, and so do we.

The applicable legal principles are well established:

> We must view all the evidence in the light most favorable to the government, keeping in mind the jury's right to assess credibility and to draw reasonable inferences from the evidence it has heard.... We recognize no distinction between direct and circumstantial evidence.

*Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991) (citations omitted). "We can only determine that the evidence is insufficient if we conclude, as a matter of law, that no reasonable juror, acting reasonably, could convict on the evidence presented." *Beatty v. United States,* 544 A.2d 699, 701 (D.C. 1988) (citation omitted). "This test applies specifically to identification evidence, as it does to any other kind of evidence." *In re R.H.M.,* 630 A.2d 705, 707 (D.C.1993) (citation omitted). When there is only a single identifying witness, "the test is whether a reasonable person could find the identification convincing beyond a reasonable doubt, given the surrounding circumstances." *Beatty, supra,* 544 A.2d at 701 (citations omitted); *accord, e.g., Hill v. United States,* 541 A.2d 1285, 1287 (D.C.1988).

Although the evidence identifying Marcus Gethers was not as strong as the government might have wished it to be, we are satisfied that it was strong enough. Mr. Hollis testified that he saw the faces of both intruders when they burst into his apartment and that daylight was coming in through a window next to the door. Although there was some disagreement as to the weather conditions that day,[9] it was undisputed that the crime took place in the middle of the morning, just after 9:30 a.m. Hollis said that when the two men entered, he was "staring at [Marcus'] face and the barrel of the gun at one time." When Marcus Gethers' counsel asked if he "got a real good look at [Marcus'] face" before he was shot, Hollis replied, "Yes, ma'am." Most significantly, Hollis testified that he had known Marcus Gethers for ten years before the shooting and had seen him only a week earlier; the two men were not strangers to each other. Finally, at the end of his redirect examination, the prosecutor asked Hollis, "Is there any doubt whatsoever in your mind that Marcus Gethers shot you?" He answered tersely, "He shot me."

Marcus Gethers' main complaint is that Hollis did not identify him to the police as the second gunman until twenty-two days after the shooting. Hollis was shot on September 25; he first gave Marcus Gethers' name to the detectives on October 17. The trial judge was troubled about this delay, but he attributed it to the seriousness of Hollis' wounds and the fact that he was close to death for several days:

> [I]f we were talking about a case where there had been no injury and no traumatic event, therefore no explanation as to why he wouldn't name someone he knew, albeit not as well as Kevin Gethers, we might have a different situation. But, since I think *there is a factual basis for the jury saying to itself that there is a reasonable explanation for why he didn't identify him earlier,* I think, weighing the evidence in the light most favorable to the government, that the motion [for judgment of acquittal] should be denied. [Emphasis added.]

We note also that as early as September 26, the day after the shooting, Hollis indicated to Detective Rich that there was a second gunman, even though he did not give a name to that second man until three weeks later. Finally, Hollis' mother testified that her son told her "approximately a week" after the

---

9. One witness testified that on September 25 it was raining "quite heavily," while another witness said it was "a warm sunny day."

shooting that "C.B.'s nephew Marcus" was the second man. She also said that she passed this information along to Detective Johnson. Even though Johnson did not corroborate that statement, Mrs. Hollis' testimony was properly before the jury for such consideration as the jury might choose to give it. On the record as a whole, we simply cannot say, "as a matter of law, that no reasonable juror, acting reasonably, could convict on the evidence presented." *Beatty, supra,* 544 A.2d at 701 (citation omitted).

The cases on which Marcus Gethers principally relies are all distinguishable on their facts. In *In re R.H.M., supra,* there was just one eyewitness to a midnight firebombing, who testified that he was able only to "glance" at the perpetrators. That witness, when he viewed an array of photographs, selected three pictures and said that they "looked familiar" from the night of the crime. Because he failed to identify the appellant at trial, and because saying that someone "looked familiar" was not an identification, we held that there was no identification evidence at all from which a trier of fact could find guilt. 630 A.2d at 708–709. In *Beatty v. United States, supra,* the principal identifying witness (Smothers) picked the defendant out of a photographic array and said he was the bagman in an armed robbery. At trial, however, the prosecutor did not ask Smothers to make an in-court identification. When defense counsel asked him on cross-examination whether he was sure that Beatty was the bagman, he replied, "No, I'm not." Three other eyewitnesses testified that Beatty was not the bagman. On this record we concluded that there was no evidence showing that Smothers' photographic identification was reliable, and thus we reversed Beatty's conviction. 544 A.2d at 702–703.

Finally, in *Crawley v. United States,* 320 A.2d 309, *rehearing en banc denied,* 325 A.2d 608 (D.C.1974), the police arrested a suspect—Crawley—who was noticeably taller, heavier, and older than either of the burglars described by the victim, who had looked out a second-story window and seen two men running away from his house carrying a tele-vision set. In addition, Crawley's clothing was almost totally different from that described by the victim; only the pants were the same color. Crawley was taken back to the scene of the crime, where the victim identified him, but there was neither a lineup nor a photographic identification. At trial the victim failed to identify Crawley at all. We held that this combination of factors—the discrepancy between the description and the defendant's appearance, the fact that the witness was looking down on the burglars from an elevated vantage point (which, we said, should not have affected his ability to observe the clothing accurately), and the lack of an in-court identification—rendered the showup identification unreliable and thus insufficient. Particularly important in *Crawley* was the fact that there were several flaws in the evidence, not just one:

> It may be that any one of the above factors, when viewed alone, is insufficient to compel the conclusion that there is a substantial likelihood of irreparable misidentification, but in this case, *when all factors are taken together,* we hold that there is a substantial likelihood of irreparable misidentification. Therefore, the motion for judgment of acquittal should have been granted.

320 A.2d at 312 (emphasis added).

We reversed in *R.H.M., Beatty,* and *Crawley* for a variety of reasons, none of which are present here. We said in *R.H.M.* that cases in which reversals are required because the identification evidence was insufficient are "very rare." *See* 630 A.2d at 706 & n. 1. This is not one of those rare cases. We hold that a reasonable juror could find Marcus Gethers guilty beyond a reasonable doubt, on the basis of all the evidence.

## VI

For the foregoing reasons, the convictions of both appellants are

*Affirmed.*