Vernon M. BOYKIN, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–211.

District of Columbia Court of Appeals.

Argued April 8, 1999.
Decided Sept. 23, 1999.

Gregory A. Cotter, Washington, DC, appointed by the court, for appellant.

Gregory G. Marshall, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown and Martin D. Carpenter, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and REID, Associate Judges.

1. D.C.Code §§ 22–2403 and 22–3202 (1996).

2. D.C.Code § 22–3204(b) (1996).

3. D.C.Code § 22–3204(a) (1996).

4. The apartment building, known as the Barry Apartments, was on Rock Creek Ford

TERRY, Associate Judge:

Appellant Boykin was convicted of second-degree murder while armed,[1] possession of a firearm during a crime of violence,[2] and carrying a pistol without a license,[3] all arising out of the shooting death of Gary Jordan. On appeal, Mr. Boykin contends that the trial court erred when it precluded defense counsel from eliciting evidence that a government witness disposed of a gun shortly after the shooting. He claims that evidence about the gun was an integral part of his defense that another person, also a government witness, shot Mr. Jordan. Ruling that the only evidence connecting the gun to the alleged third-party perpetrator was not reliable, the court held that the gun evidence was not relevant. Without deciding whether the trial court erred, we hold that any possible error was harmless and therefore affirm the conviction.

I

### A. The Government's Evidence

Shortly before 6:00 p.m. on December 8, 1994, Kevin Holley and three friends, Gary Jordan, Maurice Williams, and Raymond Pettus, stopped at a McDonald's restaurant at the corner of Georgia Avenue and Peabody Street, Northwest, while on their way to a basketball game. While his friends went inside, Holley stayed in the parking lot to eat food he had previously purchased from a different restaurant. As he sat in his car, he saw a friend from school, Kenitra Tinsley, standing in the doorway of a nearby apartment building where she lived.[4] When she waved at him, Holley walked over to speak with her. While Holley and Tinsley were talking, appellant Boykin came out of the building and said something "as if he was mad."[5]

Road, directly behind the McDonald's parking lot.

5. On cross-examination, Holley acknowledged that Boykin did not threaten him and that they did not have an argument.

"Just to throw him off like it was nothing" and "let him know that she is not my girl," Holley grabbed Tinsley and remarked, "She [is] just my little sis." Holley then returned to his car in the parking lot. From there he saw Boykin and Tinsley leave the apartment building and run in different directions. Concerned, Holley drove up to the front door of the McDonald's to pick up his friends.

Boykin's cousin, Brian Warren, returned home shortly thereafter to find Tinsley knocking on his door. She told him that "some guys from Emery Park [were] trying to jump your cousin around the corner." Joined by Eric Brock, Warren's friend and neighbor, Warren and Tinsley headed back to the Barry Apartments. When the three of them rounded the front of the building, they could see Kevin Holley and Gary Jordan at the upper end of the nearby McDonald's parking lot.[6] According to Warren's testimony, Holley was uttering obscenities and "threatening everybody," while Jordan was trying to calm him down, telling him to "be cool . . . and all that." Warrren, Brock, and Tinsley did not see Boykin anywhere in the vicinity, so they started to leave. Just then, however, Boykin emerged from around the side of the apartment building. Boykin, Warren, and Brock then proceeded together across the parking lot toward the restaurant.

Holley, meanwhile, had driven back to the restaurant entrance to let his friends "know that something might be going on" and to urge them to hurry. Holley wanted to leave because he was "not in his area." Jordan returned to the car with Holley, but the others remained inside waiting for their food. Through the car's mirrors Jordan and Holley saw Boykin, Warren, and Brock approaching. Jordan recognized Warren and got out to talk to him. When Holley also stepped out of the car, Boykin invited him to go behind a trash dumpster to fight; Holley refused, and the two began arguing. Jordan continued his conversation with Warren, while Brock stood on the restaurant steps.

Raymond Pettus and Maurice Williams came out of the restaurant to find their friends Jordan and Holley arguing with Warren and Boykin. They walked into the parking lot and stood next to Jordan, less than three feet from Boykin and Warren. They quickly realized that Boykin was upset because Holley had been talking to Tinsley,[7] while Jordan and Warren were attempting to calm things down.[8]

Holley then noticed a police officer standing at the door of the restaurant and decided he should move his car because there "was too much attention around [the] car" and he "didn't want to make a scene." As Holley headed toward the car, Boykin asked him, "What are you running to get? A gun?" Holley replied, "No, man. We are trying to leave." Holley then drove out of the lot to find a parking space on Georgia Avenue, while Jordan continued talking to Warren.[9]

After Holley left, Boykin asked Jordan, "What the [expletive] is up with you?" Then turning to Brock, who was still standing on the steps of the restaurant, he said, "Hey, Brock, tell him he don't know me." Pettus, Jordan, and Williams then started to walk away. Just as they turned their backs, Boykin pulled out a .38 caliber revolver and shot Jordan twice in the back

6. The parking lot slopes downward from the front to the rear. Holley was standing near the entrance to the lot.

7. According to Pettus, Boykin said, "What are you doing? What is up with you talking to my girl?"

8. Warren testified that he and Jordan had agreed to take their groups of friends and walk away in opposite directions.

9. Warren testified that he believed Holley was going for a gun when he moved toward the car, so he left the parking lot and ran back to his house, about a block away, before the shooting began. Brock, however, testified that he and Warren ran back to Brock's grandmother's house together, immediately after the first shot was fired.

from a distance of three to six feet. Hearing the shots, Williams "ducked down and turned around and [saw] the gun in Boykin's hand."[10] He and Pettus both saw Boykin run to the rear of the parking lot toward the Barry Apartments immediately after the shooting. Williams noticed that Warren ran in the same direction.

Despite his wounds, Jordan ran to a nearby liquor store, followed by Pettus. As Jordan was coming out of the store, Pettus caught up with him, and together they walked toward a police cruiser that was pulling out of the parking lot next to the Fourth District police station, directly across Georgia Avenue. Jordan told the officers in the car that he had been shot and exclaimed, "I am about to die. I am about to die." The police sat Jordan down in the back of the car and asked him for a description of his assailant. Jordan told

Officer John Branch that the shooter had "a dark-colored trashman's suit on . . . possibly blue in color," and that he had run in the direction of the Barry Apartments after the shooting. Pettus gave police a similar description of the gunman's clothing.[11] The police broadcast a lookout for a person matching the description. Moments later, when the officers asked who shot him, Jordan responded (according to Pettus), "Eric Brock. The boy who shot me was Eric Brock."[12]

While driving around the block searching for a place to park, Holley saw Warren and Boykin crossing the street in front of the apartment building where he had earlier visited with Ms. Tinsley.[13] Boykin was carrying a gun in his right hand. When he saw Holley, Boykin started running toward 13th Place, but Warren walked over to the car to talk to Holley. After speak-

10. Three witnesses saw or heard Boykin fire the shots that killed Jordan. Williams and Pettus testified that they were standing next to Jordan when the shooting occurred. Williams heard three shots and immediately turned around to see Boykin holding a short black revolver in his right hand. Pettus said that he saw Boykin pull the gun from his pocket and was looking directly at him when he fired the shots. Eric Brock initially testified that he did not know who the shooter was. However, when he was impeached with his grand jury testimony, he admitted that he saw Boykin shoot Jordan.

11. All the witnesses gave similar descriptions of Boykin's apparel on the night of the shooting. Holley described Boykin as wearing New Balance running shoes and a green one-piece jumpsuit that zipped or buttoned up the front, "like he had just come from work." Eric Brock testified that Boykin was wearing a one-piece "blue or black jumpsuit" that a "carpenter" or "mechanic" might wear. Maurice Williams characterized Boykin's attire as "a blue gas station jumpsuit with a zipper in the front and some New Balance [shoes] and a black skull cap." Warren described the garment Boykin wore as "a dark blue or dark green coverall-type thing."

12. This was what Pettus said on direct examination. On cross-examination, however, Pettus stated that Jordan had said it was the person who was with Eric Brock that shot him. In his grand jury testimony, Pettus also

recalled that Jordan identified the shooter as "the boy with Eric Brock." Officer Warren Jones testified that Jordan never said that the shooter was the person with Brock; to the contrary, he remembered Jordan as specifically naming Eric Brock. Officer Branch testified that Jordan repeated Brock's name twice when he asked Jordan who shot him. Branch added, however, that "he seemed to be a little bothered . . . like he didn't want to . . . answer or whatever, or he was like maybe searching through his mind . . . at which point he came out with a name." Branch also said that when Jordan first gave a description of the gunman, he was alert, but that when he and Jones later asked who shot him, Jordan was "fading" and nearly unconscious and had difficulty answering the question. Notably, Jordan had not seen Boykin before that evening and apparently did not know his name. He did, however, know Brock.

13. Warren, who said he left the parking lot when Holley went to his car, testified that he heard gunshots from his house, but he did not go back to find out what happened. He also stated that Brock came up on his porch approximately an hour and a half after the shooting. Brock testified, however, that the police arrived at his grandmother's house about fifteen to thirty minutes after the shooting. Brock was arrested that evening and charged with Jordan's murder, but was released a week later.

ing with Warren, Holley went back to the McDonald's parking lot to pick up Jordan, Pettus, and Williams. By then, however, the lot was filled with police cars and an ambulance, and officers instructed Holley not to stop. As he drove away, Holley recognized some of Jordan's clothes lying in the street and realized that something had happened to him.

Holley drove two blocks to a recreation center at Emery and Madison Streets where he and his friends often played basketball. There he encountered Maurice Williams, who had gone there immediately after the shooting. At the Washington Hospital Center later that evening, Holley and Williams spoke with detectives. Holley told the police that Boykin, Warren, and Brock had been in the parking lot just before the shooting took place. He described Boykin and said that he had seen Boykin with a gun.

### B. The Defense Evidence

The only witness called by the defense was Homicide Detective Robert Parks. On December 21, thirteen days after the shooting, Detective Parks showed Williams an array of nine photographs, including a picture of Boykin. After looking at the photographs for approximately one minute, Williams was unable to identify any of the men depicted as the one who shot Jordan.[14]

### C. The Gun in the Mailbox

Following the voir dire of the jury, but before the parties presented any evidence, the prosecutor disclosed to the court that Brian Warren, whom the government expected to call as a witness, had been granted immunity for his testimony. Before the grand jury, Warren had testified that he

did not know anything about a gun connected to the shooting involving his cousin, Vernon Boykin. After invoking the Fifth Amendment at a later proceeding, however, Warren disclosed to his attorney that he had disposed of a gun that was found in the mailbox at his home a day or two after Jordan was shot. The gun had been discovered by "another family member, a young person," who brought it to Warren's attention. Because the government could not link the gun to Boykin, the prosecutor said, he did not plan to bring out any information about it during the trial.

Later, however, to buttress the defense theory that Brock was the gunman, defense counsel asked Warren, "[W]hen Brock came up onto your porch, he gave you a gun, didn't he?" Brock answered, "No, he didn't." Defense counsel was seeking to elicit an admission from Warren that he had disposed of the gun and that Brock either gave him the gun or left it in the mailbox on the night of the shooting, before the police arrested him. The prosecutor objected on the ground that counsel did not have a good faith basis for believing that Brock gave Warren the gun.[15] In an ex parte bench conference, defense counsel revealed that an undisclosed person had told a defense investigator that he or she had "heard that Brian Warren received a gun that was used by Eric Brock in the shooting and that Brian Warren got rid of it." Characterizing the evidence linking Brock and the gun as "rank hearsay," the court ruled that counsel did not have a good faith basis for the question and struck it from the record, instructing the jury that it could not consider the question or its answer in its deliberations. Neither party made any further attempt to introduce evidence about the gun.

---

14. Earlier, during the government's case, Williams testified that he had identified Boykin as the gunman at a lineup seven months after the shooting.

15. The prosecutor did not challenge defense counsel's good faith basis for believing that Warren had disposed of a gun but, rather, contested counsel's good faith basis for asking Warren whether Brock had given him the gun. Moreover, the prosecutor did not ask to have Warren's answer excluded, but simply wanted an opportunity to explain to the jury why Warren had been immunized and to rebut any testimony elicited by the defense.

## II

Appellant contends that the trial court erred when it prevented his counsel from attempting to elicit testimony from Warren that he disposed of a gun found in his mailbox a day or two after the shooting and that the gun was put there by Brock on the night of the shooting. He claims that such evidence was crucial to his defense that Brock was the gunman.

■ The Sixth Amendment guarantees to criminal defendants not only the right to confront and cross-examine witnesses against them, *Davis v. Alaska*, 415 U.S. 308, 315–318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *accord, e.g., Stack v. United States*, 519 A.2d 147, 151 (D.C. 1986), but also "the right to present evidence that someone else committed the offense for which [he] is on trial." *Elliott v. United States*, 633 A.2d 27, 32 (D.C. 1993). These rights, however, are not unlimited. *See, e.g., Ray v. United States*, 620 A.2d 860, 862 (D.C.1993); *Scull v. United States*, 564 A.2d 1161, 1164 (D.C. 1989). A defendant's right to pursue a particular line of cross-examination is circumscribed by general principles of relevance, *Winfield v. United States*, 676 A.2d 1, 4 (D.C.1996) (en banc); *see Jordan v. United States*, 722 A.2d 1257, 1260 (D.C. 1998), *cert. denied,* — U.S. ——, 119 S.Ct. 1276, 143 L.Ed.2d 369 (1999), and a trial judge may limit cross-examination "to prevent harassment, prejudice, confusion of the issues, or repetitive, cumulative, or only marginally relevant questioning." *Scull*, 564 A.2d at 1164. "Relevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *Punch v. United States*, 377 A.2d 1353, 1358 (D.C.1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978).

■ In the context of a third-party perpetrator defense, relevant evidence is that which "tend[s] to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense." *Johnson v. United States*, 552 A.2d 513, 516 (D.C.1989), adopted by the en banc court in *Winfield*, 676 A.2d at 5 (emphasis added in *Winfield*). "The 'focus' of the standard is not on the third party's guilt or innocence, but on 'the effect the evidence has upon the defendant's culpability,' and in this regard it 'need only *tend* to create a reasonable doubt that the defendant committed the offense.'" *Winfield*, 676 A.2d at 4 (quoting *Johnson*, 552 A.2d at 517 (emphasis in *Johnson*)); *see Freeland v. United States*, 631 A.2d 1186, 1189 (D.C.1993) ("the focus is properly on the reasonable possibility that someone else might have committed the crime for which the defendant stands charged and not on whether the defendant can produce proof beyond a reasonable doubt that a third person is guilty").

■ Despite the rather inclusive reach of the *Winfield* relevance standard, *see Gethers v. United States*, 684 A.2d 1266, 1271 (D.C.1996) (noting that *Winfield* "relaxed ... the test for connecting the charged offense to an allegedly culpable third party"), *cert. denied*, 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997),[16] trial courts should still exclude "evidence that 'is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.'" *Winfield*, 676 A.2d at 5 (quoting *Johnson*, 552 A.2d at 516). Since, by its very nature, evidence that someone other than the defendant committed the crime "carries with it the risk that the jury will be distracted from deciding the defendant's guilt or innocence and will instead focus on someone else's," *Gethers*, 684 A.2d at 1271,

16. In *Winfield*, 676 A.2d at 5, we expressly overruled the prior "clearly linked" standard established in *Brown v. United States*, 409 A.2d 1093 (D.C.1979), and *Beale v. United States*, 465 A.2d 796, 803 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

"[t]he judge must ... balance the probative value of the evidence 'against the risk of prejudicial impact.'" *Winfield*, 676 A.2d at 5 (citation omitted). When dealing with evidence of a third-party perpetrator, "the trial judge [has] discretion to exclude marginally relevant evidence creating the danger that ... [it] will distract the jury from the issue in this case." *Id.* "Generally speaking, a trial court ruling that certain evidence is not relevant or probative is a highly discretionary decision which will be upset on appeal only upon a showing of grave abuse." *Gethers*, 684 A.2d at 1271 (internal quotation marks and citations omitted); *see Porter v. United States*, 561 A.2d 994, 996 (D.C.1989) (trial judge "has wide latitude to impose reasonable limits on cross-examination ... based on concerns about ... harassment, prejudice, confusion of the issues, or interrogation that is only marginally relevant").

In order to substantiate a third-party perpetrator defense, a defendant must proffer some evidence, either circumstantial or direct, of "a third party's actions, motives, opportunity, statements [or] declarations against penal interest. Such evidence may consist of one fact or circumstance, or a set of facts or circumstances, which, in the aggregate, establishes the necessary link, connection or nexus between the proffered evidence and the crime at issue." *Johnson*, 552 A.2d at 516 (citations omitted).

In this case, certainly, there was evidence which could suggest that Brock was the gunman. Brock was at the scene throughout the events leading up to and including the murder, and two police officers testified that Jordan, in a dying declaration, identified Brock as the shooter. Their recollection of Jordan's exact words differed, but both specifically recalled that Jordan did not say that it was the person with Eric Brock who shot him. Even Pettus initially testified that Jordan identified Eric Brock as the shooter. It was only on cross-examination that Pettus, when confronted with what he had told the grand jury, changed his testimony and said that Jordan identified the shooter not as Brock but as the person who was with Brock. There was also evidence from which one might infer, despite conflicting testimony, that Brock was wearing a one-piece coverall on the night of the shooting, since he testified that he was working on his car just before the events leading up to the murder.

The issue, however, is not whether there was sufficient evidence to substantiate appellant's third-party perpetrator defense, but whether appellant had a "well reasoned suspicion" for his proposed cross-examination of Warren about the gun found in his mailbox.[17] *See Scull*, 564 A.2d at 1164. To establish that the proposed line of questioning was more than "an improbable flight of fancy," *id.*, appellant relies on the following facts: (1) a gun was found in Warren's mailbox a day or two after Jordan was shot; (2) Warren knew there had been a shooting; (3) Brock was Warren's best friend;[18] (4) Brock's grandmother lived four doors down the street from Warren; (5) Brock came to Warren's front porch shortly after Jordan was shot; (6) Jordan named Brock as the person who shot him; (7) there was no showing that Warren was involved in other activities that would have resulted in a gun's being left in his mailbox shortly after the shooting; (8) Warren disposed of the gun instead of turning it over to the police; and (9) Warren invoked his Fifth Amendment

---

17. Defense counsel proposed asking Warren three questions: (1) "Did Eric Brock come to your porch that night before he was arrested?"; (2) "After he was arrested, within the next couple of days, did you dispose of a gun?"; and (3) "Did Eric Brock give you the gun?" Counsel also acknowledged that she would "have to live with" Warren's answers.

18. Boykin also points out that he and Warren were not very close, suggesting that Warren would be more likely to cover up for Brock, his best friend, than for Boykin.

privilege, based on his grand jury testimony that he knew nothing about the gun with which Jordan had been fatally shot. Finally, defense counsel proffered that some unidentified person had told her investigator that he or she had heard that Warren had received and disposed of the gun used by Brock in the shooting.

We agree that defense counsel had at least a well reasoned suspicion that the gun found in the mailbox was connected to Jordan's death. While there are other plausible explanations as to how the gun got there,[19] the temporal and spatial proximity between the murder and the appearance of the gun in the mailbox support a reasonable inference that the gun could have been used to kill Jordan. We are somewhat less persuaded that counsel had the requisite well reasoned suspicion that Brock gave the gun to Warren. Certainly, the principal evidence proffered to the trial judge on this point, the investigator's double hearsay statement, was flimsy. Moreover, the proffer was not that Brock had given Warren the gun but that he had left it in Warren's mailbox on the night of the murder,[20] where it supposedly lay for up to two days, undiscovered by anyone—e.g., a mailman—until it was retrieved by Warren.

 But we need not decide this issue here. We will assume, for the sake of argument, that the trial judge should have allowed defense counsel to ask Warren the proposed questions. Given the strength of the evidence against Boykin, however, we are satisfied that, even if there was error, "there [was] no realistic possibility that the verdict would have been different had the defense been allowed to pursue further" its theory that Brock was the gunman. *Jordan*, 722 A.2d at 1262 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Three eyewitnesses identified Boykin as the shooter. Two of them (Pettus and Williams) were only a couple of feet from the victim when he was shot, and the other (Brock) was only about fifteen feet away. Jordan himself described his assailant to the police as wearing a trashman's outfit, and several other witnesses testified that Boykin was wearing a dark, one-piece coverall on the night of the shooting. Brock, on the other hand, denied that he was wearing any type of coverall that night, and his testimony on that point was corroborated by Pettus, who recalled that Brock was not dressed like Boykin. Likewise, Williams described Brock's outfit on the night of the murder as consisting of blue jeans and a tan coat.

Notwithstanding the officers' testimony that Jordan identified Brock by name as the gunman, Pettus remembered hearing Jordan identify the shooter as the person who was with Brock. Jordan also told the police that his assailant had run toward the Barry Apartments on Rock Creek Ford Road, the same direction in which Pettus and Williams had seen Boykin flee. Moments after the shooting, Holley saw Boykin cross the street in front of the Barry Apartments with a gun in his right hand. All the witnesses specifically denied seeing Brock with a gun that evening.

Finally, the record does not suggest that Brock had any motive to kill Jordan. There was no evidence that Jordan and Brock were involved in an argument or that there was any hostility between them. In fact, from the testimony it appears that Brock was on the sidelines during the entire dispute. Boykin, on the other hand, was angry and had been quarreling with Holley for talking to "his girl." Once Holley left, Boykin turned his rage against Jordan, Holley's friend. Any suggestion that Brock might have killed Jordan on Boykin's behalf was undermined by Brock's testimony that he did not "really know" Boykin and that he had only "seen

**19.** According to a proffer by the prosecutor, Warren was prepared to testify that his front porch was accessible to the general public.

**20.** Brock could only have put it there that night, since he was in police custody for a week following the murder.

him [Boykin] a few times" prior to the night of the murder.[21]

We are also persuaded that any prejudice to Boykin was slight in light of the fact that, except for the proposed testimony about the gun found in the mailbox, defense counsel was permitted to present her third-party perpetrator defense without hindrance. Throughout the trial and in closing argument, counsel vigorously pursued her theory that Brock was the gunman.[22] She extensively cross-examined Brock and used the opportunity to imply, through her questions, that Brock had killed Jordan. Since Warren denied that Brock had given him the gun,[23] it is extremely doubtful that the defense theory of the case would have been advanced in any meaningful way by counsel's proposed questions. Given its proffer of Warren's expected testimony, the government likely would have rebutted any possible inferences that might have been drawn from Warren's testimony during its redirect examination. Thus, although any possible error would have been of "constitutional magnitude" since it "went to the heart of the defense theory," *Stack*, 519 A.2d at 154, we are convinced beyond a reasonable doubt that such error, if it occurred, did not have an effect on the verdict. *See United States v. Cunningham*, 330 U.S.App. D.C. 315, 324, 145 F.3d 1385, 1394, *cert. denied* —— U.S. ——, 119 S.Ct. 627, 142 L.Ed.2d 566 (1998).[24]

Therefore, we hold, without deciding whether the trial court actually erred, that any possible error was harmless beyond a reasonable doubt. The judgment of conviction is accordingly

*Affirmed.*

---

21. Furthermore, the autopsy report showed that whoever shot Jordan was both behind and below him. Given the downward slope of the parking lot from front to back and Boykin's position in relation to where Jordan was standing, it appears that Boykin was behind and below Jordan as Jordan turned to walk away. Brock, on the other hand, was on the steps at the entrance to the restaurant, off to Jordan's side.

22. Defense counsel also asked the court to instruct the jury on her third-party perpetrator defense, and the court did so.

23. That testimony was later stricken from the record.

24. As the court observed in *Cunningham:*

Recent Supreme Court cases ... have clarified that harmless error review calls for an inquiry as to whether the Government has shown beyond a reasonable doubt that the error at issue did not have an effect on the verdict, not merely whether, absent the error, a reasonable jury could nevertheless have reached a guilty verdict.

330 U.S.App. D.C. at 324, 145 F.3d at 1394 (citations omitted).