# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1803-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>            Plaintiff-Respondent-Petitioner, <br>    v. <br> General Grant Wilson, <br>            Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(No cite)
(Ct. App. 2013 – Unpublished)

| | |
|---|---|
| OPINION FILED: | May 12, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 4, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Victor Manian |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ZIEGLER, J., ROGGENSACK, C.J., concur(Opinion Filed.) |
| DISSENTED: | ABRAHAMSON, BRADLEY, JJ., dissent (Opinion Filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *Maguerite Moeller*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For the defendant-appellant, the cause was argued by *Anne Berleman Kearney*, with whom on the brief was *Joseph D. Kearney* and *Appellate Consulting Group*, Milwaukee.

An amicus curiae brief was filed by *Carrie Sperling*, *John A. Pray*, and the *Frank J. Remington Center*, on behalf of the University of Wisconsin Law School.

No. 2011AP1803-CR
(L.C. No. 1993CF931541)

STATE OF WISCONSIN  :  IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent-Petitioner,

  v.

General Grant Wilson,

      Defendant-Appellant.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**MAY 12, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed.*

¶1  DAVID T. PROSSER, J.   This is a review of an unpublished decision of the court of appeals, reversing a judgment of conviction for a Milwaukee County homicide as well as a subsequent order denying postconviction relief.

¶2  The case requires us to determine whether, in 1993, the Milwaukee County Circuit Court, Victor Manian, Judge, erred by excluding evidence proffered by the defendant, General Grant Wilson (Wilson), that a third party committed the homicide for which Wilson was being tried.

¶3 The law is well established that a defendant has due process rights under the United States and Wisconsin Constitutions to present a theory of defense to the jury. However, a defendant's ability to present specific evidence to support a defense at trial may be subject to conditions or limitations. When a defendant seeks to present evidence that a third party committed the crime for which the defendant is being tried, the defendant must show "a legitimate tendency" that the third party committed the crime; in other words, that the third party had motive, opportunity, and a direct connection to the crime. State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).

¶4 In this case, the State accused Wilson of killing Evania (Eva) Maric (Maric) in the early-morning hours of April 21, 1993. Before the shooting, Maric had been sitting in her car with Willie Friend (Friend), a man with whom she was romantically involved. They were parked outside an illegal after-hours club operated by Friend's brother.

¶5 According to Friend, General Grant Wilson pulled up in his gold Lincoln Continental, got out, approached Maric's car, and began firing a large-caliber handgun. Friend fled, narrowly avoiding bullets fired in his direction. An eyewitness, Carol Kidd-Edwards, saw Friend flee and saw a shooter fire an additional five to seven shots into the driver's side of Maric's car with a smaller-caliber handgun. Kidd-Edwards watched the shooter walk toward the passenger side of the gold Lincoln

before leaving her line of sight.  She then heard a car door close and saw the car speed away.

¶6   At trial, Wilson blamed Friend for Maric's murder. Wilson theorized that Friend had lured Maric to her car and kept her talking until an unknown assassin or assassins could kill her and frame Wilson for the crime.

¶7   To support this theory, Wilson attempted to introduce the testimony of two witnesses: Mary Lee Larson and Barbara Lange.  Both Larson and Lange indicated they would testify that Friend had slapped and threatened Maric about two weeks before her murder.  The circuit court ruled that the testimony was inadmissible because the issue was not who killed Maric, but rather, whether Wilson killed Maric.  After a seven-day trial, the jury found Wilson guilty of first-degree intentional homicide (Maric) and attempted first-degree intentional homicide (Friend).  On October 4, 1993, the court sentenced Wilson to life imprisonment for the homicide plus 20 years of imprisonment for the attempted homicide.

¶8   In June of 1996, Wilson filed a postconviction motion seeking a new trial based on the court's decision to exclude Wilson's proffered testimony from Larson and Lange.  The court denied the motion, and Wilson's attorney failed to file an appeal.  In September of 2010, the court of appeals reinstated Wilson's direct appeal due to his counsel's error.  In January of 2011, Wilson filed another motion with the circuit court seeking a new trial.  The circuit court denied the motion, and Wilson appealed.

¶9 The court of appeals summarily reversed Wilson's conviction and the circuit court's order denying postconviction relief. The court determined that Friend had the opportunity to kill Maric and that the State failed to show that the circuit court's alleged error in not admitting Wilson's proffered evidence was harmless. State v. Wilson, No. 2011AP1803-CR, unpublished order (Wis. Ct. App. Oct. 22, 2013). The court reasoned that Friend's involvement could have been direct (i.e., Friend could have been the shooter himself) or indirect (i.e., Friend could have engaged a gunman or gunmen to kill Maric); and given the conflicting evidence, the State could not meet its burden of showing that there was no reasonable possibility that the circuit court's error contributed to the guilty verdict. The State appealed, and we granted review.

¶10 We reaffirm the Denny test as the appropriate test for circuit courts to use to determine the admissibility of third-party perpetrator evidence. However, we conclude that, for a defendant to show that a third party had the "opportunity" to commit a crime by employing a gunman or gunmen to kill the victim, the defendant must provide some evidence that the third party had the realistic ability to engineer such a scenario. Here, Wilson has failed to show that Friend had the opportunity to kill Maric, directly or indirectly; consequently, it was not error for the circuit court to exclude Wilson's proffered evidence. Accordingly, we reverse.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

4

¶11  Maric was shot to death in the 3200 block of North 9th Street in Milwaukee at about 5:00 a.m. on April 21, 1993.  Two weapons were used in the shooting: a .44 caliber gun and a .25 caliber gun.  Maric was shot seven times in total: once in the chest and once in the back with the .44, and five times in the left front and side of her torso with the .25.  Willie Friend was present at the shooting and was the principal witness against Wilson.

¶12  When police conducted an investigation at the crime scene, they recovered several bullets and bullet fragments: one .44 caliber jacketed bullet was found in the grassy area between the curb and sidewalk, a .44 caliber lead bullet was found nearby in the ground, another .44 caliber lead bullet was found in the front yard of an adjacent house on North 9th Street; four .25 caliber brass casings were found in Maric's car, one in the front seat area and three in the back.

¶13  The police investigation quickly focused on Wilson based on Friend's statement, shortly after the shooting, that Wilson was the shooter.  Later that morning, Lieutenant Michael LaPointe of the Milwaukee Police Department, along with two detectives and other officers, went to Wilson's place of employment.  LaPointe informed Wilson that they were investigating a shooting, that he was a suspect, and that he was under arrest.  Wilson gave the officers permission to search his two lockers at work as well as his car.  The officers recovered pictures of the victim from one of the lockers and a .38 caliber revolver from the trunk of his car.  Later, LaPointe and other

5

officers searched Wilson's house and recovered a .357 caliber revolver from Wilson's bed. LaPointe also recovered two boxes that formerly contained .25 caliber handguns. Additionally, LaPointe recovered two .25 caliber cartridges from Wilson's home.

¶14 Detective Michael Young interviewed Wilson on April 22. Detective Young asked Wilson if he owned any .25 caliber handguns, and Wilson answered that he owned three .25 caliber Raven[1] semiautomatic pistols: police had custody of one, his mother had the second, and his brother had the third. None of the five weapons cited above was one of the murder weapons.

¶15 Detective Young also asked Wilson if he owned a .44 magnum revolver; Wilson answered that he did not. When Detective Young subsequently asked Wilson if he had ever owned a .44 magnum revolver, Wilson replied that he had not.

¶16 After Wilson denied owning a .44, police questioned Terry Jean Bethly, a friend of Wilson. Bethly informed the police that on April 3, 1993, she and Wilson went to a shooting range and Wilson brought a .44 with him. Bethly stated that she bought ammunition for Wilson's .44 that day. Bethly also said

---

[1] Transcripts in the record describe this gun as a "Ravin," which is probably a misspelling by the court reporter. Raven Arms was a weapons manufacturer founded in 1970 that specialized in low-cost handguns. See Nicholas Freudenberg, Lethal but Legal: Corporations, Consumption, and Protecting Public Health 48 (2014). The Raven Arms MP25 was one of the guns most used in crimes in the 1990s. Peter Harry Brown and Daniel G. Abel, Outgunned: Up Against the NRA 157 (2010).

that she had seen Wilson with the .44 on another occasion. Police also questioned Wilson's brother, who confirmed Wilson's possession of a .44. After learning this, Detective Michael Dubis questioned Wilson again regarding his ownership of a .44, but Wilson continued to deny ever owning or possessing one.

¶17 On April 26, the State charged Wilson with First-Degree Intentional Homicide While Possessing a Dangerous Weapon and Attempted First-Degree Intentional Homicide While Possessing a Dangerous Weapon.[2] He was bound over for trial after a preliminary examination. The State filed an information with the same charges on May 5, to which Wilson pled not guilty. Trial was scheduled for June 28, 1993. After pretrial motions, jury selection, and opening statements, testimony began on June 30. Below are highlights of the trial testimony.

A. Willie Friend's Testimony

¶18 At trial, Willie Friend testified that he entered into an intimate relationship with Maric in 1992, after having known her for about 12 years. On April 20, 1993, Friend asked Maric to pick him up at the Milwaukee County Courthouse after a child support hearing.[3] The time was around 4:00 or 5:00 p.m. The two drove to Maric's home in South Milwaukee after picking up some medication for Maric's mother. Friend left after Maric lent him

---

[2] Contrary to Wis. Stat. §§ 940.01(1), 939.32, and 939.63(1)(a)2. All subsequent references to the Wisconsin Statutes are to the 1991-92 version unless otherwise indicated.

[3] Friend testified that he had four children, three of whom were under the age of 18.

7

her car and he returned about 11:00 p.m. They briefly drove around the area, then headed to the north side of Milwaukee, stopping at a tavern "on 3rd and Center between Center and Hadley, I believe." They remained at the tavern, for "a few drinks," for "an hour or two."

¶19 Upon leaving the tavern, they drove west on Center Street and observed a gold Lincoln parked near another tavern. Friend said that Maric remarked that "there go General's car." Friend said he noted that the gold Lincoln had a license plate with "G-Ball" on it. When the prosecutor showed Friend a picture of Wilson's car, Friend identified Wilson's car as the car he had seen that night.[4]

¶20 Friend and Maric kept driving on Center Street to 17th, where they turned right to stop "at this chicken place" to get something to eat. They then drove to Friend's mother's house located at 3859 North 9th Street. They parked in front of the house to eat their chicken.

¶21 Soon Wilson pulled up in the same gold Lincoln that Friend had seen earlier. It had "the inside dash lights on." Wilson was driving with an unknown person in the front seat. Friend said he saw Wilson and identified him, although he had never seen him before except in a "picture photo" that Maric had shown him. After eyeing Maric's car, Wilson drove away. Three

---

[4] Wilson's sister, Sandra Wilson, later testified that she located five other Lincolns in the community to discount the uniqueness of Wilson's car.

or four minutes later Wilson drove by again, which caused Maric to have, as Friend described it, a "hyper-reaction."

¶22 Friend testified that he and Maric remained at his mother's house for an hour or so before Maric left in her car to return home. It was around 2:00 a.m. He testified that while they were at his mother's house, Maric expressed concerns about Wilson, with whom she was trying to end a relationship.

¶23 Afterwards, Friend walked south to the house of his brother, Larnell "Jabo" Friend, located at 3288 North 9th Street. Friend admitted under pressure that Jabo's house could be characterized as an "after hours place." About the time that Friend reached the house, Maric arrived and told Friend that Wilson had tried to run her off the road. She explained that Wilson walked up to her car holding a revolver and told her that if he saw her with Friend again, he would kill them both.

¶24 Maric and Friend stayed at Jabo's house for a while. Then, about 4:30 a.m., Friend walked Maric to her car. Maric's car was parked on the corner of 9th and Concordia, facing north, on the same side of the street as Jabo's house. After some time sitting in the car, Friend saw Wilson's car approach from the north and pull up directly across from Maric's car. Friend testified that he knew the car was Wilson's and was the same car he had seen earlier that night because of the color and fresh paint job, and because the car was "clean." Friend got out of Maric's car as Wilson's car approached, believing that Wilson wanted to talk to him about the situation. Friend testified

9

that the only person he saw in the car was Wilson but that he could not say whether someone else was in the car.

¶25 Instead of talking, Wilson got out of the driver's side of the Lincoln and approached the driver's side of Maric's car with a "blue steel large revolver" in his left hand. Wilson started shooting, and Friend ducked down beside Maric's car, with the passenger door open between him and Wilson, then began running. A bullet went through the door, and bullets hit the concrete around Friend, causing dirt to fly up and hit him as he ran to a passageway between two houses.[5] Friend ran through the passageway and around a house, and heard about three or four gunshots in rapid succession from a smaller gun before hearing a car door slam and the fast acceleration of an engine.

¶26 When Friend returned to the street Wilson's car was gone. He found Maric lying across the seat sideways, facing the passenger side. After raising her up, Friend saw a large, bloody wound on Maric's chest. He then went to Jabo's house to tell him that Maric had been shot. A neighbor called for medical assistance, which arrived shortly thereafter.

¶27 Friend identified Wilson as the shooter at the crime scene. Later, at the police station, he identified Wilson in a photo lineup as the person who shot at him when he was next to

---

[5] Detective Dennis Kuchenreuther later corroborated the existence of bullets and scattered dirt in this area when he testified to the location of bullets in the ground, the presence of abrasions on the sidewalk, a gouge in the dirt, and scattered dirt on the sidewalk.

Maric's car.  Friend also told the police that Wilson was stocky and was wearing gold-rimmed glasses.

### B. Carol Kidd-Edwards' Testimony

¶28  On the morning of April 21, 1993, Carol Kidd-Edwards, who lived at 3291 North 9th Street, was awake in her bedroom, putting on her shoes to take her husband to work.  At about 5:00 a.m. she heard about five very loud, consecutive gun shots.  When the shots began, she dove to the floor.  When they stopped, she ran to the window to see what was happening.  She saw a man with a brown leather jacket, whom she later identified as Friend, running away from a car, which she later identified as Maric's car, parked on the corner across the street from her house.  She then saw Friend "take[] refuge on the side between two houses, of a house directly across the street from [hers]." Kidd-Edwards testified that she did not see any objects in Friend's hand.

¶29  Kidd-Edwards' house was the third from the corner on the west side of 9th Street.  She said she could see everything to the corner across the street but had an obstructed view of the street and sidewalk on her side of the street.  She testified that she saw a "gold toned Continental, a mark version of the Continental" near the corner on her side of the street. When shown a picture of Wilson's car, Kidd-Edwards stated that his car appeared to be like the car she saw.  In giving her description, she demonstrated considerable knowledge of Lincoln automobiles.

11

¶30  Kidd-Edwards testified that as Friend was running from Maric's car, she saw a man walking from the passenger side of the Lincoln, which was in a blind spot from her bedroom window. Kidd-Edwards described the man as "a brown toned color black man," "roughly six feet," with a "top fade" hairstyle. Kidd-Edwards stated that she did not remember whether the man was wearing glasses. She was unable to get a good view of the man's face.

¶31  As the man was walking towards Maric's car, Kidd-Edwards saw him "top load[] a gun" and pull back the top of the gun. The man approached the driver's side of Maric's car and fired five to seven shots into the car. They were not as loud as the previous shots, suggesting a smaller gun. Afterwards, the man walked back towards the Lincoln into her blind spot. Although she did not see the man get into the car, she heard the door shut and saw the car quickly pull off and drive south, past her house. Kidd-Edwards testified that she could not see whether the man got into the passenger side of Wilson's car, but she could see the driver's side and did not see anyone get into that side of the car.

¶32  Kidd-Edwards stated that she did not see anyone other than the man firing the shots and Friend. After the Continental drove away, Kidd-Edwards heard Friend pound on her door and called 911 after Friend yelled repeatedly, "call 911, call 911." Kidd-Edwards stated that upon seeing the victim up close, she

appeared to be pregnant.   She later asked Friend whether the victim was pregnant, and he told her that she was.[6]

### C. General Grant Wilson's Testimony

¶33 Wilson testified that he met Maric on June 18, 1988 and had maintained some sort of relationship with her until the time of her death.   When asked whether he had ever been near Jabo's house on 9th Street, Wilson testified that Maric had driven by when he was in the car, pointed out the house to him, and said that if "something ever happened to her that . . . would be the place."

¶34 One of Wilson's defenses was that he was at home when the shootings occurred.   Wilson relied on an alibi witness, Rosanne Potrikus, to support his story that he did not shoot Maric.   Wilson testified that on the night of the murder, he went to see Potrikus at a bar where she worked.   He called the bar Throttle Twisters.[7]   After Potrikus closed the bar, she and Wilson went to another bar in his car.   After learning that that bar was closed, Wilson and Potrikus drove to a Kentucky Fried Chicken on Capitol Drive.   Afterwards, Wilson testified that the

---

[6] Dr. Jeffrey Jentzen, the forensic pathologist assigned to the case, performed a complete autopsy on Maric and testified that she was not pregnant.

[7] In 1993 the Twisters bar was located at 508 West Center Street, Milwaukee.

two drove around Capitol Drive and then around 8th and 9th Streets.[8]

¶35  After Wilson dropped Potrikus off at her car, they drove west on Center Street toward the freeway.  Wilson exited the freeway on Silver Spring Drive and drove to his home on 74th and Carmen, arriving sometime between 3:30 a.m. and 4:00 a.m.[9] He parked his car in the front of his house.  Wilson stated that his roommate, Pedro Smith, was not home at that time.  Wilson went to sleep on the couch and woke up around 5:15 a.m., and eventually got ready for work, which started at 7:00 a.m.[10]

¶36  Finally, when Wilson was questioned about whether the .44 he brought to the shooting range with Terry Bethly was his, he admitted to owning a .44 at that time.  He said it was a Smith and Wesson Magnum, not a Sturm Ruger (which apparently was the type of .44 used in the shooting).  Wilson stated that he did not tell the truth to the police when they questioned him

---

[8] This testimony corroborated earlier testimony by Potrikus about her activities with Wilson that evening.

[9] Wilson's testimony about his movements coincides with Friend's testimony about where he and Maric saw Wilson's car that evening. Wilson, of course, did not admit that he drove by Jabo's house on North 9th Street at approximately 5:00 a.m.

[10] Detective Brian O'Keefe testified that Wilson told him he arrived at his home at 3:00 a.m.  Pedro Smith testified that he woke up around 3:35 a.m. on April 21, 1993 to go to work but did not see or hear Wilson anywhere in the house, including on the couch, and still did not see Wilson when he left for work at about 3:55 a.m.  Smith also testified that he did not see Wilson's car in front of the house when he left for work.

14

about ever owning a .44 because he did not have it in his possession at that time.  Wilson testified that he brought the gun with him on his recent vacation to Florida, and on his way back to Wisconsin he stopped in Alabama and exchanged it for certain "illicit pleasures" from "drug dealers and pimps."[11]

D. Attempts to Introduce Third-Party Perpetrator Evidence

¶37  Mary Lee Larson testified that she knew Maric, Wilson, and Friend.  When asked whether she noticed Maric act in any way that indicated she was afraid of Wilson, Larson stated, "No. Not recently."  When Wilson's defense counsel, Peter Kovac, attempted to ask Larson whether Maric was afraid of Friend, the State objected and the court sustained the objection.  The court allowed Attorney Kovac to make an offer of proof, during which Kovac asked Larson whether she heard Friend threaten Maric at any time during the two weeks leading up to her death.  Larson responded, stating that one time, when Friend and Maric were at her house in her kitchen, Friend told Larson that "he had to keep Eva in check," and further, that "if she wouldn't be in check, he'd kill her, and she knew it."  Then, Maric responded that "yes, he would."  Additionally, when Attorney Kovac asked Larson whether she ever observed any physical contact between Maric and Friend, Larson stated that she saw Friend slap Maric at a motel room.

---

[11] Neither of the weapons used in the murder was ever located.

¶38  At the end of his offer of proof, Kovac stated that "Our theory is that it's Willie who did it."  In response, the court stated, "The issue is really not who did it.  The issue is whether the defendant did it."  The court added, "The statement by this witness [Larson] about what happened sometime previous is, I believe, hearsay."  The court reasoned that allowing Larson to testify would "cause the jury to speculate."  Accordingly, the court sustained the State's objection to Larson's testimony.  The court similarly excluded Barbara Lange's proffered testimony about Friend and Maric's relationship and the threat Friend made to Maric in Larson's kitchen.

¶39  In closing arguments, Kovac stated that "Willie Friend should be a suspect."  Kovac continued:

> Now, I'll tell you, right from the beginning . . . Willie did not fire the shots.  There were two people who came by in that car, at least two people.  There was somebody in the driver's area seat.  There was somebody in the passenger seat.  Those two people shot and killed Eva.  I don't know who those people are . . . .  But I think when you look at what's going on here, it's reasonable to me that Willie was involved.  Willie had her there at this location knowing that these guys were going to come by.

To support his theory, Kovac suggested that Friend thought Maric was pregnant with his child and that he wanted to avoid another child support case.  Kovac also suggested that the shots fired at Friend were for show, to make it look as though he was in harm's way when he was not.

E. Jury Verdict and Postconviction Proceedings

16

¶40  On July 8, 1993, the jury found Wilson guilty of both counts.  At the sentencing hearing on October 4, 1993, the court sentenced Wilson to life in prison with parole eligibility after thirty years for the first count, and to a maximum of twenty years, consecutive to his first sentence, for the second count.

¶41  On June 3, 1996——almost three years later——Wilson filed a postconviction motion requesting a new trial.  Wilson alleged that the trial was fundamentally unfair and denied him his right to present a complete defense.  He also claimed newly discovered evidence not available at the time of trial substantiated his theory of defense and undermined the theory of the prosecution.  The court denied this motion without a hearing.  The court concluded that the reasons set forth on the record sufficed for not allowing Wilson to introduce the proffered evidence to support his theory that Friend was involved in Maric's murder.  The court further determined that Wilson did not provide any evidence to support his claim of new evidence.

¶42  Wilson did not file an appeal of the circuit court's ruling on his postconviction motion.  However, in a 2010 petition for a writ of habeas corpus, Wilson alleged that his counsel performed deficiently and abandoned Wilson by failing to pursue appellate review of the court's denial of Wilson's motion.[12]  On September 14, 2010, the Court of Appeals granted

_____

[12] The Office of Lawyer Regulation publicly reprimanded Attorney Kovac in 2008 for violating multiple rules of professional conduct while representing Wilson.

17

Wilson's petition and reinstated his postconviction and appellate rights, concluding that Attorney Kovac provided ineffective assistance of counsel to Wilson.

¶43 On January 24, 2011, Wilson filed another motion for postconviction relief, requesting a new trial. In this motion, Wilson alleged that his constitutional rights were violated through ineffective assistance of counsel and judicial error. Wilson argued that, under the standard adopted in Denny, "Willie . . . had the opportunity——in time and place——to have participated in Eva's killing" and that Willie had a motive to kill her. Wilson grounded one of his ineffective assistance of counsel claims on counsel's alleged failure to make a comprehensive offer of proof before trial and to show the court why available evidence satisfied the Denny standard so as to make Mary Lee Larson's and Barbara Lange's testimony regarding Friend's relationship with Maric admissible.

¶44 Once again, the court denied Wilson's motion for postconviction relief.[13] The court determined that Wilson's trial counsel was not ineffective for failing to proffer certain evidence that third parties might have committed the offense and for failing to explain why that evidence was admissible. The court concluded that it was not reasonably probable that the trial judge would have admitted the proffered evidence, as it would have been deemed either insufficient to satisfy Denny or inadmissible hearsay.

---

[13] Milwaukee County Circuit Judge Jeffrey Conen presided.

18

¶45 Wilson appealed, arguing that he was denied a meaningful opportunity to present a complete defense during his criminal trial because the court would not allow him to introduce third party perpetrator evidence.  The court of appeals recognized the importance of Denny, stating,

> Evidence that a person other than the defendant committed the charged crime is relevant to the issues being tried, and thus admissible, "as long as motive and opportunity have been shown and as long as there is also some evidence to directly connect a third person to the crime charged which is not remote in time, place or circumstances."

State v. Wilson, No. 2011AP1803-CR, unpublished order, at 3 (Wis. Ct. App. Oct. 22, 2013) (quoting Denny, 120 Wis. 2d at 624).

¶46 The court of appeals then noted that the State conceded that Wilson's offer of proof was arguably sufficient to establish that Friend had a motive to kill Maric and that Friend's presence at the scene of the crime established that Friend had a direct connection to the crime.  Id. at 6. However, the court rejected the State's position that Friend did not have the opportunity to commit this crime.  Id. at 7.  The court concluded that a "review of the evidence shows that Friend had the opportunity to commit this crime, either directly by firing the first weapon or in conjunction with others by luring Maric to the place where she was killed."  Id.  The court stated that "[u]nder Denny, Wilson should have been allowed to introduce evidence that Friend was involved in Maric's murder."  Id.  The court ultimately reversed Wilson's conviction and the

19

circuit court's order denying postconviction relief, and remanded the case for further proceedings. Id. at 11. The State sought review, and this court granted review on November 5, 2013.

## II. STANDARD OF REVIEW

¶47 This court reviews a circuit court's decision to admit or refuse to admit evidence for an erroneous exercise of discretion. Weborg v. Jenny, 2012 WI 67, ¶41, 341 Wis. 2d 668, 816 N.W.2d 191. When the circuit court's denial of admission of the proffered evidence implicates a defendant's constitutional right to present a defense, however, the decision not to admit the evidence is a question of constitutional fact that this court reviews de novo. State v. Knapp, 2003 WI 121, ¶173, 265 Wis. 2d 278, 666 N.W.2d 881, vacated and remanded, 542 U.S. 952 (2004), reinstated in material part, 2005 WI 127, ¶2 n.3, 285 Wis. 2d 86, 700 N.W.2d 899.

## III. DISCUSSION

¶48 Although a circuit court generally has the discretion to deny the admission of evidence, that discretion is subject to constitutional limitations; a circuit court may not refuse to admit evidence if doing so would deny the defendant's right to a fair trial. Crane v. Kentucky, 476 U.S. 683, 689-90 (1986). Nevertheless, evidence offered by a defendant in his own defense must be relevant. Milenkovic v. State, 86 Wis. 2d 272, 286-87, 272 N.W.2d 320 (Ct. App. 1978). It is this tension between the defendant's rights and the relevancy requirement that the court of appeals addressed in Denny.

20

¶49 <u>Denny</u> involved the conviction of Kent A. Denny for the murder of Christopher Mohr. <u>Denny</u>, 120 Wis. 2d at 617. Denny and his brother were accused of stabbing Mohr 57 times. <u>Id.</u> At trial, Denny attempted to introduce evidence that he had no motive to kill Mohr, but others did. <u>Id.</u> at 621. The circuit court refused to allow Denny to present the evidence, ruling it was irrelevant. <u>Id.</u> Denny appealed, claiming that the court's refusal to allow him to introduce the evidence was a violation of his constitutional right to present a defense. <u>Id.</u> at 621-22.

¶50 The court of appeals stated that it was a "general rule . . . that evidence of motive of one other than the defendant to commit the crime can be excluded when there is no other proof directly connecting that person with the offense charged." <u>Id.</u> at 622. The court looked to the California case of <u>People v. Green</u>, 609 P.2d 468 (Cal. 1980), to support its position. It agreed with the California Supreme Court that the purpose of limitations on the admission of evidence as to the possible motive of a third party is to "place reasonable limits on the trial of collateral issues . . . and to avoid undue prejudice to the People from unsupported jury speculation as to the guilt of other suspects . . . ." <u>Denny</u>, 120 Wis. 2d at 622 (quoting <u>Green</u>, 609 P.2d at 480) (alterations in original). The <u>Denny</u> court disagreed, however, with California's requirement that evidence connecting a third party to the crime be

21

"substantial," holding that standard to be unfair to defendants.[14] Id. at 623.

¶51 The court of appeals instead turned to Alexander v. United States, 138 U.S. 353, 356 (1891), and the "legitimate tendency" test created in that case. To support the introduction of third-party perpetrator evidence under Alexander, the court of appeals explained, "there must be a 'legitimate tendency' that the third person could have committed the crime." Denny, 120 Wis. 2d at 623 (citing Alexander, 138 U.S. at 356-57). The court noted that the defendant need not establish the guilt of the third party to the level that would be necessary to sustain a conviction. Id. However, "evidence that simply affords a possible ground of suspicion against another person should not be admissible." Id. The Denny court thus created a "bright line standard requiring that three factors be present, i.e., motive, opportunity, and direct connection" for a defendant to introduce third-party perpetrator evidence. Id. at 625.

¶52 We ratified the Denny test in Knapp, 265 Wis. 2d 278, ¶¶175-183, noting the constitutional underpinnings of the

_____

[14] Two years after State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984), the California Supreme Court backtracked on the substantiality requirement: "To be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." People v. Hall, 718 P.2d 99, 104 (Cal. 1986) (en banc).

standard in United States Supreme Court precedent. Id., ¶178 (citing Alexander, 138 U.S. 353). Indeed, since Knapp, the Supreme Court has gone on to cite the Denny case with approval. See Holmes v. South Carolina, 547 U.S. 319, 327-28 n.* (2006). We now reaffirm that the Denny test is the correct and constitutionally proper test for circuit courts to apply when determining the admissibility of third-party perpetrator evidence.

¶53 We pause to note that each piece of a defendant's proffered evidence need not individually satisfy all three prongs of the Denny test. Some evidence provides the foundation for other evidence. "[F]acts give meaning to other facts," and certain pieces of evidence become significant only in the aggregate, upon the proffer of other evidence. State v. Vollbrecht, 2012 WI App 90, ¶26, 344 Wis. 2d 69, 820 N.W.2d 443. "This is precisely why Denny requires that all three be shown before evidence of a third-party perpetrator is admitted at trial." Id.

¶54 Although the Denny case is sound in principle, it does not provide complete clarity as to the meaning and contours of two of its prongs. This ambiguity is understandable in light of the multitude of fact situations in which the Denny test may be employed. Denny is firm, however, that three factors be present, implying that "opportunity" and "direct connection" have distinct meaning. Thus, the fact that a person with a motive to commit the crime is present at the crime scene is not enough to satisfy both "opportunity" and "direct connection."

¶55 In theory, many people may qualify as having the opportunity to commit a crime by virtue of their presence at the crime scene or their presence (at the time of the crime) in the vicinity of the crime scene. But presence does not necessarily create either motive or direct connection; and presence does not necessarily move the defendant's theory beyond speculation, even when other evidence does not eliminate a third-party as having the opportunity to commit the crime.

¶56 Essentially, the Denny legitimate tendency test requires a court to answer three questions.

¶57 First, did the alleged third-party perpetrator have a plausible reason to commit the crime? This is the motive prong.

¶58 Second, could the alleged third-party perpetrator have committed the crime, directly or indirectly? In other words, does the evidence create a practical possibility that the third party committed the crime? This is the opportunity prong.

¶59 Third, is there evidence that the alleged third-party perpetrator actually committed the crime, directly or indirectly? This is the direct connection prong. Logically, direct connection evidence should firm up the defendant's theory of the crime and take it beyond mere speculation. It is the defendant's responsibility to show a legitimate tendency that the alleged third-party perpetrator committed the crime.

¶60 A person's presence at the crime scene may be analyzed under "opportunity" but the opportunity prong may be eliminated during this analysis because of additional information. A person's presence at the crime scene also may be analyzed under

24

the third prong, direct connection.  What must be stressed is that "presence" alone will normally not satisfy both of these distinct prongs.

¶61 To provide additional guidance, we will discuss the three prongs one by one, keeping in mind that it is unconstitutional to refuse to allow a defendant to present a defense simply because the evidence against him is overwhelming.

## A. Motive

¶62 Circuit courts often encounter the question of motive in homicide cases.  A defendant's motive to commit a homicide is widely considered to be relevant.  See D.E. Buckner, Necessity That Trial Court Charge Upon Motive in Homicide Case, 71 A.L.R.2d 1025 (1960).  "'Motive' refers to a person's reason for doing something . . . .  Evidence of motive does not by itself establish guilt."  Wis JI——Criminal 175.  Motive is not an element of any crime; rather, motive "may be shown as a circumstance to aid in establishing" a particular person's guilt.  Id.

¶63 The admissibility of evidence of a third party's motive to commit the crime charged against the defendant is similar to what it would be if that third party were on trial himself.  Because motive is not an element of any crime, the State never needs to prove motive; relevant evidence of motive is generally admissible regardless of weight.  See State v. Berby, 81 Wis. 2d 677, 686, 260 N.W.2d 798 (1977).  The same applies to evidence of a third party's motive——the defendant is not required to establish motive with substantial certainty.

25

Evidence of motive that would be admissible against a third party were that third party the defendant is therefore admissible when offered by a defendant in conjunction with evidence of that third party's opportunity and direct connection.

¶64 It may be that the strength and proof of a third party's motive to commit the crime is so strong that it will affect the evaluation of the other prongs. Nonetheless, the <u>Denny</u> test is a three-prong test; it never becomes a one- or two-prong test.

### B. Opportunity

¶65 The second prong of the "legitimate tendency" test asks whether the alleged third-party perpetrator <u>could have</u> committed the crime in question. This often, but not always, amounts to a showing that the defendant was at the crime scene or known to be in the vicinity when the crime was committed.

¶66 As a legal concept, "opportunity" appears in the Wisconsin Statutes in the context of "other acts" evidence. <u>See</u> Wis. Stat. § 904.04(2):

> (2) OTHER CRIMES, WRONGS, OR ACTS. . . . [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, <u>opportunity</u>, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(Emphasis added.)

26

¶67 The analysis of other acts evidence to demonstrate opportunity applies to third-party perpetrator evidence:

> The case law as well as § 904.04(2) permits the introduction of other act evidence to show a person's (whether a party or third person) "opportunity" to engage in certain conduct.  "Opportunity" is a broad term . . . ; proof of opportunity may be relevant to place the person at the scene of the offense (time and proximity) or to prove whether one had the requisite skills, capacity, or ability to carry out an act. . . .  It is incumbent on the proponent, however, to show the relevance of the "opportunity" evidence.

7 Wis. Prac., Wis. Evidence § 404.7 (3d ed.) (footnotes omitted).

¶68 The defense theory of a third party's involvement will guide the relevance analysis of opportunity evidence in a Denny case.  If the third party is to be implicated personally as the shooter, then opportunity might be shown by the party's presence at the crime scene.  See People v. Primo, 753 N.E.2d 164, 168–69 (N.Y. 2001) (evidence that the third party was at crime scene admissible in conjunction with ballistics linking third party to the weapon used).  If the defense theory is that a third party framed the defendant, then the defense might show opportunity by demonstrating the third party's access to the items supposedly used in the frame-up.  Cf. Krider v. Conover, 497 Fed. Appx. 818, 821 (10th Cir. 2012) (third party's access to defendant's blood and hair samples only speculative evidence of opportunity without connecting third party to crime).  In all but the rarest of cases, however, a defendant will need to show more than an unaccounted-for period of time to implicate a third party.  Cf.

27

Vollbrecht, 344 Wis. 2d 69 (a third party's unaccounted-for period of time enough to show opportunity in murder with extremely distinctive characteristics that also were present in a case in which the third party was convicted).

¶69 Overwhelming evidence against the defendant may not serve as the basis for excluding evidence of a third party's opportunity (or direct connection to the crime): "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." Holmes, 547 U.S. at 331. However, this holding does not govern situations in which overwhelming evidence demonstrates that the proposed third party could not have committed the crime. Courts are not evaluating the strength of only one party's evidence in such cases; they are in fact weighing the strength of the defendant's evidence (that a third party committed the crime) directly against the strength of the State's evidence (that the third party did not commit the crime).

¶70 Courts may permissibly find——as a matter of law——that no reasonable jury could determine that the third party perpetrated the crime in light of overwhelming evidence that he or she did not. Cf. People v. Pouncey, 471 N.W.2d 346, 350 (Mich. 1991) ("When, as a matter of law, no reasonable jury could find that the provocation was adequate [to form the basis of a defense to the charge], the judge may exclude evidence of the provocation."). In sum:

> While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

Holmes, 547 U.S. at 326.

### C. Direct Connection

¶71 "The 'legitimate tendency' test asks whether the proffered evidence is so remote in time, place or circumstances that a direct connection cannot be made between the third person and the crime." Denny, 120 Wis. 2d at 624 (citation omitted). No bright lines can be drawn as to what constitutes a third party's direct connection to a crime. Rather, circuit courts must assess the proffered evidence in conjunction with all other evidence to determine whether, under the totality of the circumstances, the evidence suggests that a third-party perpetrator actually committed the crime. See, e.g., Shields v. State, 166 S.W.3d 28 (Ark. 2004); State v. Oliver, 821 P.2d 250, 252 (Az. Ct. App. 1991) ("The defendant must show that the evidence has an inherent tendency to connect the other person with the actual commission of the crime.") (citation omitted); People v. Hall, 718 P.2d 99 (Cal. 1986). In sum, courts are not to look merely for a connection between the third party and the crime, they are to look for some direct connection between the third party and the perpetration of the crime.

29

¶72 As with opportunity, there are myriad possibilities how a defendant might demonstrate a third party's direct connection to the commission of a crime. For example, a third party's self-incriminating statement may be used to establish direct connection. See Erwin v. State, 729 S.W.2d 709, 714-17 (Tex. Crim. App. 1987). Exclusive control of the weapon used may also establish a direct connection. Primo, 753 N.E.2d at 168-69. Mere presence at the crime scene or acquaintance with the victim, however, is not normally enough to establish direction connection. See, e.g., State v. Eagles, 812 A.2d 124 (Conn. App. 2002).

D. Whether Wilson Satisfied the Denny Standard

¶73 The State conceded in its briefing to this court that Wilson satisfied the motive and direct connection prongs of the Denny test. We regret the State's concession of direct connection inasmuch as it has necessitated discussion of factors under the heading of opportunity that arguably belong under direct connection——and vice versa.

¶74 Friend's supposed motive was his belief that Maric was pregnant, that he was responsible for her pregnancy, and that he wanted to avoid future child support. The alleged direct connection was his relationship to Maric and his presence at the crime scene (in front of his brother's house) at the time of her death. Friend's presence at the crime scene might better have been analyzed under opportunity, raising the possibility that he could have committed the crime as a conspirator and leaving his tenuous connection to the perpetration of the crime to be

30

analyzed under direct connection.  Because Friend's presence at the crime scene is not in dispute and because it has been consistently analyzed in this case as the direct connection, we assume without deciding that these two prongs have been satisfied.

¶75  This brings us to opportunity, which here must mean more than presence.  If the opportunity prong has not been met, it was not error for the circuit court to refuse to admit the proffered evidence and we need go no further.  See Denny, 120 Wis. 2d 614.

¶76  The State contends that "Wilson failed to show that Willie Friend had the opportunity to kill [Maric], either as the direct shooter or in conjunction with unknown persons he knew were planning to murder her."

¶77  The State argues first that Friend himself could not have been the shooter.  It contends that the ballistics evidence on where the .44 bullets hit and were found, combined with the consistent testimonial evidence of Kidd-Edwards and Friend about the timing of the shots fired, shows it was "impossible" that Friend could have shot Maric with the .44, then have that gun shot at him by another, as he was running away.  Both witnesses testified that the louder shots from the .44 were fired first and in rapid succession——"one right behind the other."  Friend's hands were swabbed at the crime scene for gun shot residue, and the tests were negative.  Shells were found in the area of Friend's observed flight.

31

¶78 Wilson counters that Friend could have been a "shooter" himself. He contends that ballistics evidence can be misinterpreted, that Friend and Maric were in the car for a long time before the shooting such that his position in the car at the time of the shooting was unknown, and that Kidd-Edwards did not see the first shots fired. Wilson therefore concludes that any question as to whether the State's evidence showed Friend not to be the shooter goes to the weight of Wilson's evidence, not the admissibility of it.

¶79 We note that Wilson's theory throughout the trial was that Friend's involvement was indirect——that Friend hired Maric's killer or killers as a result of his motive to kill Maric to avoid child support or some other concern. Wilson did not suggest that Friend pulled the trigger himself. "Willie did not fire the shots," his counsel told the jury. The proffered evidence that the circuit court refused to admit did not support a direct shooter theory, in part, because it was logically inconsistent with Wilson's favored theory that Friend hired someone else to be the shooter. We see no reason to belabor the point.

¶80 The State also argues that Wilson has failed to show "how Friend had the opportunity to arrange for two unnamed gunmen . . . to murder Eva [Maric]." The State relies on two points to support this argument. First, the "assailants" were driving the same type of car as Wilson. Second, the ballistics evidence and eyewitness testimony demonstrated that Friend was in real danger during the shooting; there was enough of a risk

32

of harm to Friend that it is implausible that he hired someone to make him look like a victim in that manner.

¶81 Wilson counters that nothing in the evidence excluded the possibility that Friend hired one or more hit men to kill Maric, make Friend look like a victim, and frame Wilson for the murder. In support of this theory, Wilson points to the substantial period of time——allegedly one to two hours——that Friend and Maric were in the car together prior to the shooting. Wilson claims this is evidence that Friend kept her there as a target for the shooters. Wilson also notes that Friend had time in his brother's house to arrange a hit on Maric. Here, Wilson relies on Vollbrecht, suggesting that Friend had a "limited but sufficient opportunity" under the Denny test to arrange for the murder.

¶82 Wilson argues that, for purposes of his defense, opportunity and direct connection are virtually the same thing; Friend's direct connection to the crime——his presence at the crime scene——also was his opportunity to commit the crime. As support, Wilson relies on Vollbrecht, where the court of appeals explained that "facts give meaning to other facts and . . . the significance of [the third party's] opportunity to commit the crime depends on his alleged motive and direct connection." Vollbrecht, 344 Wis. 2d 69, ¶26.

¶83 We are unpersuaded that Wilson has demonstrated a "legitimate tendency" that Friend committed the crime for which Wilson was convicted by hiring one or more persons to kill Maric. Denny's "legitimate tendency" test requires more than

33

mere possibility.  Denny, 120 Wis. 2d at 623 ("evidence that simply affords a possible ground of suspicion against another person should not be admissible").  Wilson in 1993 and Wilson now have failed to proffer any evidence that would elevate the theory of Friend's involvement in an assassination conspiracy from a mere possibility to a legitimate tendency.

¶84 Friend and Wilson testified at trial.  Their accounts are reported in some detail in this opinion.  Wilson was able to challenge Friend's credibility as a witness based on Friend's eight prior criminal convictions, his inconsistent testimony about the nature of his brother's business, and an overheard statement before the preliminary hearing in which he said to his mother that he "had to get his story together."  Wilson challenged the accuracy of Friend's testimony about the shooter being left-handed and wearing gold-rimmed glasses.  Nevertheless, the jury must have believed Friend.  Wilson did not have much success in poking serious holes in Friend's account of the series of events on the evening of April 20 and early morning of April 21.  In fact, Wilson's testimony confirmed Friend's testimony at several points——Friend's observation of Wilson's car at Throttle Twisters and Friend's testimony that Wilson drove by Maric's vehicle twice as it was parked in front of 3859 North 9th Street about 2:00 a.m. on April 21.  Friend changed his story about the length of time that he and Maric sat in Maric's car before the shooting, from several hours to the period from about 4:30 a.m. until the shooting, after Friend reluctantly admitted that he and Maric

spent most of that time in Jabo's house——the illegal after-hours club operated by his brother.

¶85 Against this background, Wilson has proffered no evidence demonstrating that Friend had the opportunity to arrange a hit on Maric during the relatively short time they were in Maric's car——no evidence that Friend had the contacts, influence, and finances to quickly hire or engage a shooter or shooters to gun down a woman on a public street. He has not shown that Friend or his alleged unnamed associates had access to a gold Lincoln Continental similar to Wilson's. He has not proffered any telephone records from Friend or Friend's brother's house that could have set up the time and place of the hit on short notice. He has not proffered any evidence of the ownership by Friend or his family of .44 and .25 caliber weapons. He has not identified any individuals as being the shooter or shooters possibly employed by Friend. In short, he has not offered any evidence whatsoever indicating that Friend had the means or access or ability to hire assassins to kill Maric at a particular place within a relatively short time frame.

¶86 Wilson's reliance on Vollbrecht is misplaced. Vollbrecht involved two separate murders that shared extremely distinctive characteristics, reducing the need for a showing of opportunity to more than the third party's unaccounted-for time. Wilson has failed to show any similarity to a previous crime committed by Friend, his brother, or any associate of Friend's, distinguishing this case from Vollbrecht. Wilson was not

35

excused from making an offer of proof as to opportunity beyond an unaccounted-for block of Friend's time.  Because Wilson failed to make an adequate offer of proof as to Friend's opportunity, it was not error for the circuit court to refuse to admit Wilson's proffered evidence to avoid speculation that might confuse the jury.[15]

¶87 Because we determine there was no error in the circuit court's decision, we need not reach the question of whether any error was harmless.

## IV. CONCLUSION

---

[15] At the court of appeals, Wilson also contended that the circuit court should have permitted him to introduce evidence implicating Larnell "Jabo" Friend in Maric's murder.  The court of appeals did not reach this issue, basing its ruling instead on the proffered evidence about Willie Friend. State v. Wilson, No. 2011AP1803-CR, unpublished order, at 7 n.4 (Wis. Ct. App. Oct. 22, 2013).  In cases where this court reverses the court of appeals and the court of appeals did not reach an issue, we will often remand the case for consideration of the issue not reached.  See, e.g., State v. Sarfraz, 2014 WI 78, 356 Wis. 2d 460, 851 N.W.2d 235.  However, "[o]nce [a] case is before us, it is within our discretion to review any substantial and compelling issue which the case presents." Univest Corp. v. General Split Corp., 148 Wis. 2d 29, 32, 435 N.W.2d 234 (1989).

Because the issue involving Jabo is so similar to the issue involving Willie (i.e., whether third-party perpetrator evidence should have been admitted), we see no need to remand to the court of appeals.  At trial, Wilson's offer of proof regarding Jabo was that Maric "had been working as a prostitute, that her pimp was Jabo, [and] that she was trying to get out."  Although this offer of proof suggested a possible motive, it described no opportunity or direct connection for Jabo to have perpetrated the crime.  In short, Wilson's proffered evidence about Jabo offered little more than "a possible ground of suspicion"; accordingly, we hold that it was not error for the circuit court to exclude it. See Denny, 120 Wis. 2d at 623.

36

¶88 On trial for murder, General Grant Wilson developed a theory that someone else fired the shots that killed Evania Maric on April 21, 1993. The details of this theory fit within the contours of the known facts of the case in a way that could not be readily disproved. However, even though the law does not require Wilson to prove that someone else committed the crime for which he was on trial, it does require more than a theory "that simply affords a possible ground of suspicion . . . ." Denny, 120 Wis. 2d at 623.

¶89 The "legitimate tendency" test ensures that proffered evidence meets the necessary evidentiary threshold before it is admitted while, at the same time, guarding the constitutional rights of defendants. The test requires a showing of the third party's motive, opportunity, and direct connection to the crime. Although proffered evidence should be understood in the context of other evidence, the three prongs of the "legitimate tendency" test are distinct from one another. Only in rare cases will the context dictate that a showing on one or two prongs is strong enough to lower the threshold for the showing on the third prong. This is not one of those cases.

¶90 We reaffirm that the Denny test is the appropriate test for circuit courts to use to determine the admissibility of third-party perpetrator evidence. However, we conclude that, for a defendant to show that a third party had the "opportunity" to commit a crime by employing a gunman or gunmen to kill the victim, the defendant must provide some evidence that the third party had the realistic ability to engineer such a scenario.

37

Here, Wilson has failed to show that Friend had the opportunity to kill Maric, directly or indirectly; consequently, it was not error for the circuit court to exclude Wilson's proffered evidence.  Accordingly, we reverse.

*By the Court.*—The decision of the court of appeals is reversed.

¶91 ANNETTE KINGSLAND ZIEGLER, J. (concurring). I join the majority opinion because it "reaffirm[s] the Denny test as the appropriate test for circuit courts to use to determine the admissibility of third-party perpetrator evidence." Majority op., ¶10. The majority opinion reaffirms that "the Denny test is a three-prong test; it never becomes a one- or two-prong test." Majority op., ¶64. I would not join the majority opinion if it were interpreted as doing anything other than reaffirming the longstanding application of the test from State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984).

¶92 I write separately to clarify that the majority opinion is intended to reaffirm the Denny test and that certain passages in the majority opinion should not be misconstrued. In particular, the majority opinion should not be read as suggesting that a defendant may sometimes introduce Denny evidence without satisfying all three prongs of the Denny test. Further, it should not be read as suggesting that a third party's presence at a crime scene can alone satisfy multiple prongs of this test, or that a third party's unknown whereabouts during a crime can alone establish that the third party had an opportunity to commit the crime.

¶93 I also write separately to explain the Denny test's requirements, purposes, and constitutional basis. A criminal defendant is constitutionally endowed with the right to present a defense. The Denny test attempts to balance a meaningful opportunity to present a complete defense, namely that a third

1

party perpetrated the crime, with the requirement that such evidence meet established standards for admissibility. Simply stated, the Denny test requires that proffered evidence create a legitimate tendency that someone other than the defendant committed the crime charged. Evidence is deemed inadmissible under Denny if it merely raises possible grounds for suspicion. The Denny test, like the test for all admissible evidence, requires that in order for third-party perpetrator evidence to be admitted, it must have the requisite indicia of reliability, be relevant, and not be unfairly prejudicial. The Denny test requires a defendant to demonstrate that the third-party perpetrator had: (1) the motive to commit the crime; (2) the opportunity to commit the crime; and (3) a direct connection to the crime.

¶94 Finally, I write separately to explain that evidence of an unknown third-party perpetrator is generally deemed inadmissible when the defendant cannot meet the Denny test. Most typically, if such evidence is admissible, it is because the evidence is deemed admissible as other acts evidence. In the present case, General Grant Wilson did not proceed under the theory that his proffered evidence was other acts evidence. Instead, Wilson sought to introduce evidence that Willie Friend hired someone to shoot Evania Maric. Wilson's defense was that, although it was not Friend who shot Maric, Friend hired someone unknown to Wilson to shoot Maric. Wilson's proffer was that, in the past, Friend, who was romantically involved with Maric, had exhibited violent behavior toward her and that she was pregnant.

2

The defense theory was that Friend wanted Maric dead because he did not want to be responsible for the baby. Wilson sought to introduce witnesses who would testify that Friend slapped Maric at least once and threatened to kill her. Wilson wished to argue, based on this proffered evidence, that Friend hired someone to murder Maric. However, Wilson's proffer failed to demonstrate that these alleged assassins were anything but purely hypothetical people. While Friend's motive possibly could have been demonstrated, opportunity and direct connection were missing. Wilson's proffered evidence was speculative, at best, and the circuit court did not err in excluding it. Simply stated, the proffered third-party perpetrator evidence was not admissible because it did not meet the long-standing Denny test.

I. THE MAJORITY OPINION REAFFIRMS THE DENNY TEST

¶95 While a majority of the court intends that this case reiterate the Denny test, I write separately because the majority opinion may need some clarification. For example, it states that "[o]nly in rare cases will the context dictate that a showing on one or two prongs is strong enough to lower the threshold for the showing on the third prong." Majority op., ¶89. That statement should not be read as eliminating a defendant's need to prevail on all three prongs of the Denny test under any circumstances. To introduce evidence that a third party may have committed the crime charged, a defendant always must satisfy all three prongs of the Denny test: motive, opportunity, and direct connection to the commission of the crime. Denny, 120 Wis. 2d at 625; see also State v. Avery, 2011

3

WI App 124, ¶43, 337 Wis. 2d 351, 804 N.W.2d 216. The majority opinion correctly recognizes that "the Denny test is a three-prong test; it never becomes a one- or two-prong test." Majority op., ¶64. To be admissible, a defendant's evidence of a third-party perpetrator must establish a "legitimate tendency" that the third party committed the crime charged. Denny, 120 Wis. 2d at 623-24. A "mere possibility" that a third party committed the crime charged is insufficient. See id. at 623 (holding that "evidence that simply affords a possible ground of suspicion against another person should not be admissible"). Evidence of a mere possibility that a third party may have committed the crime charged is deemed inadmissible because it calls for speculation, creates a trial within a trial, and lacks the sufficient indicia of reliability or probative value so to qualify as admissible evidence.

¶96 The majority opinion also states: "What must be stressed is that 'presence' alone will normally not satisfy both of these distinct prongs [opportunity and direct connection]." Majority op., ¶60. That sentence should not be read as suggesting that a third party's presence at a crime scene will automatically satisfy any one prong of the Denny test, let alone more than one prong. The majority opinion correctly recognizes that "the fact that a person with a motive to commit the crime is present at the crime scene is not enough to satisfy both 'opportunity' and 'direct connection.'" Majority op., ¶54. The majority opinion also correctly notes that presence at a crime scene does "not normally . . . establish" a third party's direct

4

connection to the commission of the crime. Majority op., ¶72 (citing State v. Eagles, 812 A.2d 124 (Conn. App. Ct. 2002)). Similarly, a third party's presence at a crime scene does not necessarily establish that he or she had an opportunity or a motive to commit the crime. See Wiley v. State, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002) (holding that an alleged third-party perpetrator had no opportunity to commit an arson because, although present at the crime scene, he lacked the mental competence to commit the crime). Accordingly, a third party's presence at a crime scene, by itself, will not automatically satisfy any one of the three prongs of the Denny test, and it will not satisfy all three prongs.

¶97 I also wish to clarify the majority opinion's statement that "[i]n all but the rarest of cases, . . . a defendant will need to show more than an unaccounted-for period of time to implicate a third party." Majority op., ¶68 (citing State v. Vollbrecht, 2012 WI App 90, 344 Wis. 2d 69, 820 N.W.2d 443). A third party's unaccounted-for period of time will never, in and of itself, satisfy the Denny test or even a single prong of this test. The majority opinion was interpreting Vollbrecht as holding that the defendant in that case satisfied the opportunity prong of the Denny test by showing that (1) a third party's whereabouts during a murder was unaccounted for; and (2) the third party was convicted of committing a very similar murder in the same area around the same time. See majority op., ¶¶68, 86. The majority opinion should have clarified its discussion of Vollbrecht and how

5

opportunity fit within the legal theories forwarded in that case. As explained earlier, the majority opinion correctly recognizes that the Denny test is always a three-prong test and that a third party's whereabouts will not satisfy multiple prongs of this test.

¶98 In sum, the majority opinion should not be read as changing the Denny test. A defendant always is required to prevail on all three prongs of the Denny test in order to introduce evidence of an alleged third-party perpetrator. The defendant's proffer must demonstrate a legitimate tendency that the third party committed the crime charged, not merely a speculative ground of suspicion in that regard. A third party's presence at a crime scene, by itself, will not necessarily satisfy any prong of the Denny test and will not satisfy multiple prongs. Similarly, a third party's unaccounted-for whereabouts during the commission of a crime will not alone satisfy any prong of the Denny test.

## II. THE DENNY TEST

¶99 I turn now to the Denny test requirements, purposes, and constitutional basis. The court of appeals in Denny created "a bright line standard requiring that three factors be present, i.e., motive, opportunity and direct connection," before a defendant may introduce evidence that a third party committed the crime charged. Denny, 120 Wis. 2d at 625. Specifically,

> [t]hird-party defense evidence may be admissible under the legitimate tendency [e.g., Denny] test if the defendant can show that the third party had (1) the motive and (2) the opportunity to commit the charged crime, and (3) can provide some evidence to directly

6

connect the third person to the crime charged which is not remote in time, place or circumstance.

State v. Scheidell, 227 Wis. 2d 285, 296, 595 N.W.2d 661 (1999) (citing Denny, 120 Wis. 2d at 623-24). The trial court remains the gatekeeper in determining what evidence is admissible and why.

¶100 Under the Denny test, "there must be a 'legitimate tendency' that the third person could have committed the crime." Denny, 120 Wis. 2d at 623 (quoting Alexander v. United States, 138 U.S. 353, 356-57 (1891)). Thus, "evidence that simply affords a possible ground of suspicion against another person should not be admissible. Otherwise, a defendant could conceivably produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased——degenerating the proceedings into a trial of collateral issues." Denny, 120 Wis. 2d at 623-24.

¶101 States use a wide variety of terminology for their Denny-type tests, such as "directly links," "substantially connects," or "points directly." See 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5180.2 (2d ed. 2012). However, despite that variation in language, many states ultimately require a defendant to establish motive, opportunity, and direct connection. See 41 C.J.S. Homicide § 328. A few jurisdictions eschew the language of a Denny-type test in favor of conventional evidentiary principles, such as relevancy and balancing probative value against prejudice. See David McCord, "But Perry Mason Made It Look So Easy!": The Admissibility of Evidence Offered by a Criminal Defendant to

7

Suggest That Someone Else Is Guilty, 63 Tenn. L. Rev. 917, 937-38 (1996); People v. Primo, 753 N.E.2d 164, 167-69 (N.Y. 2001).

¶102 The purpose of the Denny test is to allow a defendant to exercise his or her constitutional right to present a defense but also to ensure that third-party perpetrator evidence meets certain criteria for admissibility.[1] See Denny, 120 Wis. 2d at 622-23; Avery, 337 Wis. 2d 351, ¶50 (The Denny test is "a mechanism of balancing the accused's right to present a defense against the State's interest in excluding evidence that . . . is no more than marginally relevant, of extremely limited probative value, and likely to confuse the jury and waste the jury's time.") (internal quotation marks omitted); Primo, 753 N.E.2d at 168 (noting that a Denny-type test is "shorthand for weighing probative value against prejudice in the context of third-party culpability evidence"); John H. Blume et al., Every Juror Wants A Story: Narrative Relevance, Third Party Guilt and the Right to Present A Defense, 44 Am. Crim. L. Rev. 1069, 1080-85 (2007) (same); see also Ellen Yankiver Suni, Who Stole the Cookie from the Cookie Jar?: The Law and Ethics of Shifting Blame in

---

[1] The court of appeals in Denny seemed to view this test as a means of excluding evidence that is either irrelevant or, if relevant, unfairly prejudicial. See State v. Denny, 120 Wis. 2d 614, 622, 623-24, 357 N.W.2d 12 (Ct. App. 1984). See also Wis. Stat. § 904.02 (rendering irrelevant evidence inadmissible); Wis. Stat. § 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

*Criminal Cases*, 68 Fordham L. Rev. 1643, 1680-81 (2000) (noting that, although some courts view a *Denny*-type test as a means of excluding irrelevant evidence, most courts view it as a balancing of probative value against prejudicial effect).

¶103 The United States Supreme Court placed its imprimatur on what Wisconsin calls the *Denny* test. See *Holmes v. S. Carolina*, 547 U.S. 319, 327 & n.* (2006). The Supreme Court concluded that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326 (citations omitted). By excluding unfairly prejudicial evidence, the *Denny* test prevents "unsupported jury speculation as to the guilt of other suspects . . . ." *Denny*, 120 Wis. 2d at 622 (quoting *People v. Green*, 609 P.2d 468, 480 (Cal. 1980)). Hence, evidence that raises only a speculative doubt will fail the *Denny* test. See *People v. Hall*, 718 P.2d 99, 104 (Cal. 1986). A defendant has no constitutional right to present speculative, unreliable evidence in an effort to create doubt. See *Scheidell*, 227 Wis. 2d at 303-04; *Denny*, 120 Wis. 2d at 622.

¶104 In *Denny* the defendant appealed his judgment of conviction for murder, arguing that the circuit court erred by excluding evidence that a third party committed the murder. *Denny*, 120 Wis. 2d at 617. The court of appeals held that the circuit court did not err in excluding that evidence. *Id.* at 625. Denny sought to introduce testimony that the victim "'may have gotten into trouble with . . . a big drug dealer.'" *Id.*

That testimony failed to show that the drug dealer had a motive or an opportunity to commit the crime or a direct connection to the crime. Id. Denny also sought to introduce testimony that the victim owed money to another man. Id. Assuming that the man had a motive to commit the murder, the court of appeals held that Denny failed to show the man's opportunity or direct connection. Id. Finally, Denny sought to introduce testimony that the victim angered another man by purchasing a shotgun from him and later selling it. Id. The court of appeals held that this testimony established motive but failed to establish opportunity or direct connection. Id.

¶105 Courts have subsequently upheld the exclusion of third-party perpetrator evidence under Denny. For example, in State v. Jackson, the defendant was convicted of robbing a liquor store at gunpoint. State v. Jackson, 188 Wis. 2d 187, 194, 525 N.W.2d 739 (Ct. App. 1994). At trial, a liquor store employee testified that "he was 'probably about 80 percent sure'" that Jackson was the perpetrator. Id. at 191. "At the conclusion of the employee's testimony and outside of the jury's presence, Jackson requested that because of the employee's uncertainty, the employee view a photo of another man that Jackson allegedly had learned was the gunman." Id. at 192. The employee viewed photographs of six people, one of whom was the alleged third-party perpetrator, who went by the alias "Rat." Id. The employee was certain that five of the people were not the perpetrator, but he said that "Rat" could have been the perpetrator. Id. at 192-93. Based on Denny, the circuit court

10

denied Jackson's request to recall the employee to testify that "Rat" could have been the perpetrator. Id. at 193. The court of appeals held that the circuit court did not err in excluding that evidence because it "provided nothing more than grounds for suspicion . . . ." Id. at 196. The court of appeals noted that the circuit court allowed Jackson to identify "Rat" as the perpetrator and to publish the photograph of "Rat" to the jury. Id. "Thus, the trial court did not impermissibly interfere with Jackson's constitutional right to present a defense." Id.

### III. EVIDENCE OF AN UNKNOWN THIRD-PARTY PERPETRATOR IS GENERALLY DEEMED INADMISSIBLE

¶106 Evidence of an unknown third party, who is alleged to have committed the crime charged, is most often deemed too speculative to be admissible. In the present case, the proffered evidence, as it relates to unknown, alleged hit men, is inadmissible under Denny.[2] General Grant Wilson's defense theory may be viewed in one of two ways. It may be viewed as an unknown third-party perpetrator theory because the alleged actual shooter is unknown. On the other hand, the defense theory could be viewed as a known third-party perpetrator theory because Willie Friend allegedly hired the shooter. Either way, the circuit court was correct to exclude the evidence because it was speculative at best and did not meet the Denny criteria.

#### A. Unknown Third-Party Perpetrators

---

[2] Because this section discusses unknown third-party perpetrators, I do not discuss General Grant Wilson's proffered evidence as it relates to his theory that Willie Friend was the shooter.

11

¶107 In some, but not all, cases in which a defendant seeks to introduce evidence of an unknown third-party perpetrator, the defendant relies on other acts evidence. The present case does not involve any other acts evidence. "[O]ften times the defense must rely on other act evidence to raise a circumstantial inference that the third party carried out the crime." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 404.7, at 215 (3d ed. 2008). However, evidence of an unknown third-party perpetrator is often inadmissible even when it relies on other acts evidence.

¶108 In Scheidell we held that the Denny test does not apply to other acts evidence of a similar crime committed by an unknown third party who, according to the defendant, committed the crime charged. Scheidell, 227 Wis. 2d at 297. We reasoned that, "[i]n a situation where the perpetrator of the allegedly similar crime is unknown, it would be virtually impossible for the defendant to satisfy the motive or the opportunity prongs of the legitimate tendency test of Denny." Scheidell, 227 Wis. 2d at 296. Instead, evidence of a similar crime committed by an unknown third party is governed by the test for

12

determining the admissibility of other acts evidence.[3] Id. at 287-88.

¶109 The defendant in Scheidell appealed his judgment of conviction for armed burglary and attempted first-degree sexual assault. Id. at 287. He entered a woman's apartment during the night, while armed with a knife and wearing a mask, and attempted to sexually assault her. Id. at 288-90. At trial, he sought to introduce evidence that, five weeks after that burglary, an unknown assailant burglarized a woman's home at night and sexually assaulted her. Id. at 290-91. Scheidell was in jail during the second burglary, which occurred four blocks away from the previous burglary. Id. Scheidell wanted to argue that this unknown assailant committed the burglary for which he was charged. Id. We held that the circuit court "properly excluded" this other acts evidence because it was not relevant. Id. at 310. Specifically, due to several factual distinctions

---

[3] To determine whether other acts evidence is admissible, a court uses "a three-step analysis." State v. Jackson, 2014 WI 4, ¶55, 352 Wis. 2d 249, 841 N.W.2d 791. First, the evidence must be offered for an acceptable purpose under Wis. Stat. § 904.04(2), including "'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" Id. (quoting State v. Sullivan, 216 Wis. 2d 768, 772, 576 N.W.2d 30 (1998)). Second, the evidence must be relevant, which means that it must tend to make a fact of consequence more or less probable than it would be without the evidence. Id. (quoting Sullivan, 216 Wis. 2d at 772). Third and finally, the probative value of the evidence must not be "'substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.'" Id. (quoting Sullivan, 216 Wis. 2d at 772-73).

between the two burglaries, this other acts evidence was not probative of Scheidell's identity as the assailant in the first burglary.  Id. at 309-10.  In subsequent cases, Wisconsin courts have rarely held that other acts evidence of an unknown third-party perpetrator is admissible.[4]

---

[4] In State v. Wright the court of appeals upheld the exclusion of other acts evidence of an unknown third-party perpetrator under Scheidell.  State v. Wright, 2003 WI App 252, ¶45, 268 Wis. 2d 694, 673 N.W.2d 386.  Wright was convicted of eight counts of armed robbery and one count of attempted armed robbery.  Id., ¶1.  On appeal, he argued that the circuit court erred by excluding testimony of a man who identified Wright at a lineup as the perpetrator of a different robbery, but who was unable to identify Wright at a preliminary hearing.  Id., ¶3.  Wright argued that this proffered testimony was admissible other acts evidence because it suggested that whoever committed that other robbery could have committed all of the robberies for which Wright was tried and convicted.  Id.  The court of appeals held that, under Scheidell, the circuit court did not err in excluding that evidence.  Id., ¶45.  The court of appeals held "that the mere inability of a victim to identify the defendant as the perpetrator of a similar uncharged crime perforce takes the jury into the realm of conjecture or speculation."  Id.  The court of appeals noted that the proffered evidence was even more speculative than the inadmissible evidence proffered in Scheidell.  See id.  In Scheidell the defendant proffered evidence of a similar crime that he could not have committed because he was incarcerated at the time.  Id.  By contrast, Wright's "proffered testimony does not demonstrate that Wright was incapable of committing the similar crime."  Id.  "At the most, [the] proffered testimony merely shows that [the witness] could not identify Wright as the robber; it does not demonstrate that Wright could not have committed the offense."  Id.

(continued)

14

¶110 In other jurisdictions, evidence of an <u>unknown</u> third-party perpetrator is most often deemed too speculative to be admissible. See, e.g., <u>Wheeler v. United States</u>, 977 A.2d 973 (D.C. 2009); <u>Gethers v. United States</u>, 684 A.2d 1266 (D.C. 1996); <u>Neal v. State</u>, 436 S.E.2d 574 (Ga. Ct. App. 1993); <u>People v. Armstrong</u>, 704 P.2d 877 (Colo. App. 1985); <u>State v. Eagles</u>, 812 A.2d 124 (Conn. App. Ct. 2002). These cases involved traditional <u>Denny</u> evidence, not other acts evidence of a third-party perpetrator.

¶111 In <u>Wheeler</u> the defendant appealed his judgment of conviction for murder, arguing that the trial court erred by excluding his evidence that someone else committed the crime. <u>Wheeler</u>, 977 A.2d at 976-77. The defendant sought to introduce

---

In contrast, other acts evidence of an unknown third-party perpetrator was erroneously excluded in <u>State v. Davis</u>. In that case, the defendant was charged with five counts of burglary and one count of armed robbery. <u>State v. Davis</u>, 2006 WI App 23, ¶¶2-7, 289 Wis. 2d 398, 710 N.W.2d 514. One count of burglary was dismissed when the State discovered that Davis was incarcerated when that burglary occurred. <u>Id.</u>, ¶8. The victim of that burglary had twice misidentified Davis as the burglar. <u>Id.</u>, ¶¶3, 8-9. The circuit court denied Davis' motion to call that victim to testify that he had misidentified Davis as the burglar. <u>Id.</u>, ¶9. Davis believed that this other acts evidence would establish that someone who looked like him committed that burglary and thus could have committed all of the burglaries for which he was on trial. <u>Id.</u>, ¶10. The court of appeals held that this other acts evidence was erroneously excluded. <u>Id.</u>, ¶30. The court of appeals reasoned that "[t]his is not a situation where someone accused of a crime makes a general claim that someone else must have done it." <u>Id.</u>, ¶28. "Rather, here we have a burglary victim who twice misidentified Davis as the person he saw in his apartment." <u>Id.</u> "This fact provided Davis with the opportunity to attempt to prove that someone else, someone who looks a great deal like Davis, was burglarizing and robbing homes within the same general time frame." <u>Id.</u>

15

evidence that the murder victim had cocaine in his system at the time of death and, therefore, "had a 'dangerous lifestyle' and was at a 'high risk of violent death' from '[r]ival drug dealers, dissatisfied customers, or frustrated robbers.'" Id. at 990. The District of Columbia Court of Appeals held that the trial court properly excluded that evidence because it "fail[ed] to provide anything more than 'a hypothetical, unidentified person who may have had a motive' to commit the murder." Id. (quoting Gethers, 684 A.2d at 1271).

¶112 In Gethers two defendants appealed from their convictions for burglarizing an apartment together and shooting a man who lived in the apartment. Gethers, 684 A.2d at 1268. On appeal, they argued that the trial court erred by excluding evidence that someone besides them committed the burglary and shooting. Id. The proffered evidence was that the victim was a drug dealer and thus might have been shot by a disgruntled customer. Id. at 1270, 1272. The District of Columbia Court of Appeals held that the trial court did not err in excluding that evidence. Id. at 1272. The proffer of that evidence "made no showing" that a disgruntled customer, "if he or she actually existed, was connected in any way to the shooting." Id. Defense "counsel was merely trying to 'throw something out there for the jury to speculate about.'" Id.

¶113 In Neal the defendant appealed his judgment of conviction for aggravated child molestation, arguing that the trial court erred by excluding evidence that someone else committed the crime. Neal, 436 S.E.2d at 575. The evidence in

16

question was that "the mother of the victim was a cocaine addict and had casual relationships with numerous men in the family home. This testimony was offered in support of Neal's contention that one of these unidentified men . . . may have molested the victim." Id. The Georgia Court of Appeals held that the trial court did not err by excluding that evidence. Id. Evidence of a third-party perpetrator is inadmissible "where no specific individual is accused and the defendant merely speculates that a person or persons unknown may have had the opportunity to commit the crime." Id. at 576 (citation omitted). The defendant "has not presented anything other than his own speculation that unknown alleged drug users frequenting [the victim's] residence may have had the opportunity to molest the victim." Id. Because the defendant failed to show a direct connection between one of those unknown men and the crime, his proffered evidence was inadmissible. Id.

¶114 In Armstrong the defendant appealed his judgment of conviction for robbing a cafeteria with another African-American male. Armstrong, 704 P.2d at 878. The defendant argued that the trial court erred by excluding evidence that, 50 minutes prior to the robbery, a cafeteria employee saw "two unidentified black men" in the cafeteria parking lot. Id. at 879. The defendant wanted to argue during trial that those unidentified men committed the robbery. Id. The Colorado Court of Appeals held that the trial court did not err by excluding that evidence, because that evidence failed to establish a "direct connection" between the unidentified men and the robbery. Id.

17

¶115 In Eagles the defendant appealed a judgment of conviction for robbing and shooting a man. Eagles, 812 A.2d at 125-26. On appeal the defendant argued that the trial court erred in excluding his proffered evidence that someone else committed the robbery and shooting. Id. at 126. The proffered evidence was testimony from two witnesses who saw three unidentified men, none of whom was the defendant, running from the vicinity of the crime shortly after the gunshots. Id. at 127. The Connecticut Appellate Court held that the trial court did not err in excluding the evidence. Id. at 128. The appellate court reasoned that the defendant failed to present a "direct connection" between any of the three men and the crime. Id. Further, the defendant offered "no evidence of motive on the part of any of the three men to commit the crime." Id.

¶116 Consistent with the foregoing cases, General Grant Wilson's proffered evidence was inadmissible under Denny. See Scheidell, 227 Wis. 2d at 296. Further, Wilson did not attempt to introduce any other acts evidence, so his proffered evidence was inadmissible under Scheidell. Wilson attempted to introduce testimony that Willie Friend had slapped and threatened an allegedly pregnant Evania Maric, in order to argue that Friend hired assassins to kill Maric. This evidence was not other acts evidence and it fell far short of satisfying the Denny three-prong test. Wilson did not identify any possible assassins or introduce any evidence indicating that Friend arranged for Maric to be killed. In fact, Wilson "has not presented anything other than his own speculation that unknown alleged" hit men murdered

18

Maric. See Neal, 436 S.E.2d at 576. He "fail[ed] to provide anything more than 'a hypothetical, unidentified'" hit man or hit men. See Wheeler, 977 A.2d at 990 (quoting Gethers, 684 A.2d at 1271). Moreover, Wilson "made no showing" that the alleged hit men, if they "actually existed, [were] connected in any way to the shooting." See Gethers, 684 A.2d at 1272. It would require a great deal of speculation to conclude that Friend hired assassins to kill the allegedly pregnant Maric based on testimony that he slapped and threatened her once or twice. Thus, Wilson "was merely trying to 'throw something out there for the jury to speculate about.'" See Gethers, 684 A.2d at 1272. This kind of speculative evidence about unknown, alleged perpetrators is not admissible.

¶117 In sum, if Wilson's defense theory is viewed as an unknown third-party perpetrator theory because the alleged shooters are unknown, his proffered evidence is inadmissible under Denny, Scheidell, and many non-Wisconsin cases.

### B. Evidence that a Known Third Party Allegedly Hired Unknown Persons to Commit the Crime Charged

¶118 Few third-party perpetrator cases involve an allegation that a known third party arranged for unknown persons to commit the crime at issue. One such case is Freeland v. United States, 631 A.2d 1186 (D.C. 1993). In that case Larry Freeland was charged with the murder of his wife. Freeland, 631 A.2d at 1187. The trial court excluded his proffered evidence that a man named William Hawthorne hired people to commit the murder. Id. Prior to the murder of Freeland's wife, Freeland and Hawthorne were fellow prison inmates. Id. at 1188.

19

Freeland witnessed Hawthorne stab another inmate to death. Id. Freeland testified against Hawthorne in his grand jury trial regarding the stabbing death. Id.

¶119 The District of Columbia Court of Appeals held that the proffered evidence should have been admitted as Denny-type evidence. Id. at 1190. Hawthorne had a motive to hire assassins to kill Freeland's wife in order to retaliate against Freeland for his grand jury testimony and to intimidate him into not testifying against Hawthorne at trial. See id. at 1189-90. Freeland's evidence demonstrated that Hawthorne had a "clear[] link" to the murder and a "present ability to carry out the threats through others." Id. at 1189-90. Specifically, Hawthorne's associates confronted Freeland on the street several times and "repeatedly made threats to [Freeland] and his family in order to intimidate [Freeland] and to retaliate for his grand jury testimony . . . ." Id. In addition, Freeland introduced evidence showing that Hawthorne was being prosecuted for threatening other witnesses. Id.

¶120 Freeland stands in stark contrast to the present case. In Freeland the defendant introduced a substantial amount of other acts evidence showing that the alleged third-party perpetrator, William Hawthorne, was capable of having his associates carry out the murder with which the defendant was charged. Hawthorne's associates confronted Freeland in person several times and "repeatedly" intimidated and threatened Freeland and his family because Freeland was an eyewitness in Hawthorne's murder trial. By contrast, Wilson has not

20

introduced any evidence indicating that Willie Friend or his associates had previously murdered anyone. In fact, Wilson introduced no evidence showing that Friend had ever used his associates to commit any crime on his behalf. In Freeland Hawthorne's associates were real people whom Freeland saw and spoke to several times. By contrast, Wilson did not even introduce evidence indicating that Friend had associates who were willing and able to murder Maric. Wilson's proffered evidence is pure speculation about unidentified, hypothetical hit men. In Freeland the defendant also introduced evidence showing that Hawthorne was being prosecuted for threatening other witnesses. By contrast, Wilson proffered no other acts evidence at all. "[O]ften times the defense must rely on other act evidence to raise a circumstantial inference that the third party carried out the crime." Blinka, supra, at 215.

¶121 In Freeland the defendant's "hit man" theory of defense could be reasonably inferred from his proffered evidence. Simply stated, a jury need not speculate in order to conclude that, because Hawthorne's associates "repeatedly" threatened Freeland's family, those associates might have killed Freeland's wife. In the present case, Wilson's "hit man" theory of defense had no foundation in his proffered evidence. A jury would necessarily have to speculate in order to conclude that, because Friend slapped and threatened Maric once or twice, he hired assassins to kill her. Unlike Freeland's proffered evidence, Wilson's proffered evidence had nothing whatsoever to do with possible hit men. Falling far short of the proffer made

21

in Freeland, Wilson's proffered evidence was pure speculation. This kind of evidence is inadmissible.

¶122 In sum, Wilson's proffer was entirely speculative and fell short of establishing a legitimate tendency that Friend arranged for hit men to kill Maric. The circuit court did not err in excluding that proffered evidence.

¶123 For the foregoing reasons, I respectfully concur.

¶124 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

¶125 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I agree with the court of appeals that the defendant's third-party perpetrator evidence should have been admitted as a matter of constitutional law.[1] Like the court of appeals, I would grant the defendant a new trial.

¶126 The instant case revolves around the circuit court's exclusion of evidence at the defendant's trial nearly 20 years ago.

¶127 The defendant sought to introduce evidence at trial to support his contention that a third party committed the crimes alleged in the State's complaint. Such evidence is sometimes referred to as "third-party perpetrator evidence." The circuit court excluded the defendant's third-party perpetrator evidence and the defendant was convicted.

¶128 By excluding the defendant's third-party perpetrator evidence, the circuit court denied the defendant his constitutional right to present a complete defense.[2] Thus, the

---

[1] State v. Wilson, No. 2011AP1803-CR, unpublished slip op., at 7 (Wis. Ct. App. Oct. 22, 2013).

[2] Majority op., ¶¶61, 70; Holmes v. South Carolina, 547 U.S. 319, 324 (2006) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'" (quoted source omitted).).

(continued)

1

instant case presents a question of constitutional law this court decides independently but benefiting from the analyses of the circuit court and the court of appeals.[3]

¶129 I begin with a brief review of the relevant facts.

¶130 Evania Maric, the victim in the present case, was shot to death while seated in a parked car with Willie Friend, whom she was dating. Willie Friend fled and was not injured. Willie Friend thereafter reported to the police that the defendant was the shooter, which the defendant adamantly denied. The defendant was eventually charged with first-degree intentional homicide for killing the victim and attempted first-degree intentional homicide for shooting at Willie Friend.

¶131 At trial, the defendant's attorney attempted to persuade the jury that the defendant was innocent and that Willie Friend was not. To establish this defense, the

---

See also State v. Anthony, 2015 WI 20, ¶¶119, 125, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, C.J., dissenting) (linking the rights to testify and to present a complete defense by arguing that the circuit court unconstitutionally deprived the defendant of his right to testify to relevant testimony regarding self-defense and thereby prevented the defendant from presenting any defense at all); State v. Nelson, 2014 WI 70, ¶68, 355 Wis. 2d 722, 849 N.W.2d 317 (Abrahamson, C.J., dissenting) (explaining that the defendant's constitutional right to testify is embedded in the constitutional right to present a defense).

[3] The majority opinion acknowledges that the instant case presents a constitutional issue. Majority op. ¶¶47, 61. See also Anthony, 2015 WI 20, ¶43 (stating that "[w]hether an individual is denied a constitutional right is a question of constitutional fact that this court reviews independently as a question of law" (quoted source & internal quotation marks omitted)).

defendant's attorney sought to present testimony from two of the victim's friends, Mary Lee Larson and Barbara Lange, to implicate Willie Friend in the murder.

¶132 In an offer of proof, Larson stated that she had heard Willie Friend threaten to kill Maric and had observed Willie Friend slapping Maric. The defendant's attorney informed the circuit court that Lange would provide similar testimony. The testimony of Larson and Lange comprised the defendant's third-party perpetrator evidence. The circuit court ruled both witnesses' testimony inadmissible.

¶133 This was not an easy case for the jury. During deliberations, the jury informed the circuit court that it had reached an impasse. Later the next day, the jury found the defendant guilty of both charges.

¶134 The issue presented is whether the circuit court erred as a matter of law in excluding the defendant's third-party perpetrator evidence.

¶135 The circuit court cannot bar the defendant's third-party perpetrator evidence "simply because the evidence against the [defendant] is overwhelming."[4] Rather, third-party perpetrator evidence is admissible so long as the defendant shows "a 'legitimate tendency' that the third person could have committed the crime."[5]

---

[4] Majority op., ¶¶61, 70.

[5] State v. Denny, 120 Wis. 2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984).

¶136 <u>State v. Denny</u>, 120 Wis. 2d 614, 624, 357 N.W.2d 12 (Ct. App. 1984), established that a defendant fulfills the legitimate tendency test "as long as motive and opportunity have been shown and as long as there is also some evidence to directly connect [the] third person to the crime charged which is not remote in time, place or circumstances . . . ." In other words, the defendant in the instant case was required to fulfill the three-prong test set forth in <u>Denny</u> (1) by showing that Willie Friend had a <u>motive</u> to commit the crime; (2) by showing that Willie Friend had an <u>opportunity</u> to commit the crime; and (3) by presenting evidence of a <u>direct connection</u> between Willie Friend and the crime.[6]

¶137 The majority opinion struggles to clarify the <u>Denny</u> test and in doing so changes the test. Under any reasonable interpretation of <u>Denny</u>, the defendant in the instant case prevails.

¶138 The State concedes that the defendant has fulfilled the motive and direct connection prongs. The majority opinion assumes without deciding that the defendant has fulfilled the motive and direct connection prongs. Both the State and the majority opinion conclude that the defendant has not fulfilled the opportunity prong.

¶139 I review the three prongs of the <u>Denny</u> test in turn.

¶140 First, the defendant presented evidence that Willie Friend's "motive was his belief that Maric [the victim] was

---

[6] Majority op., ¶3.

4

pregnant, that [Willie Friend] was responsible for her pregnancy, and that he wanted to avoid future child support."[7] Because the defendant provided a "plausible reason" for Willie Friend to commit the crime, I conclude that the defendant has fulfilled the motive prong.[8]

¶141 Second, the defendant argued that Willie Friend's undisputed "presence at the crime scene" constituted evidence of a direct connection between Willie Friend and the crime. Based on the totality of the evidence presented (including evidence of Willie Friend's relationship with the victim, evidence that Willie Friend had previously hit and threatened to kill the victim, evidence that Willie Friend brought the victim to the location where she was murdered, and the undisputed fact that Willie Friend was present when the victim was shot), I conclude that the defendant has fulfilled the direct connection prong.

¶142 Third, the defendant argued that Willie Friend had the opportunity to hire the victim's killer(s) and set up the victim's murder.[9] In assessing this argument, the court of appeals explained that evidence presented at trial "places [Willie] Friend at the scene when the first round of shots was fired, and is consistent with [the defendant's] contention that

---

[7] Id., ¶74.

[8] See id., ¶57.

[9] Id., ¶81.

5

[Willie] Friend was involved in the murder by luring [the victim] to a place where she would be ambushed."[10]

¶143 The court of appeals concluded that Willie Friend "had the opportunity to commit this crime, either directly by firing the first weapon or in conjunction with others by luring [the victim] to the place where she was killed."[11]

¶144 I agree with the court of appeals. I conclude, along with the court of appeals, that the defendant has met all three prongs of the Denny test for the admissibility of third-party perpetrator evidence. The defendant was therefore entitled to introduce the testimony of Larson and Lange to implicate Willie Friend in the victim's murder.

¶145 In my opinion, the circuit court's exclusion of the defendant's third-party perpetrator evidence constituted an error of law that denied the defendant his constitutional right to present a complete defense.

¶146 The court of appeals applied harmless error review to this error of law and concluded that the error was not harmless.[12] Willie Friend was the State's primary witness. With the admission of the defendant's third-party perpetrator evidence, the jury may not have considered Willie Friend a credible witness. The jury may instead have believed the defendant. Accordingly, I agree with the court of appeals that

---

[10] Wilson, No. 2011AP1803-CR, unpublished slip op., at 7.

[11] Id.

[12] Id. at 10.

if harmless error review applies to the circuit court's exclusion of the defendant's third-party perpetrator evidence (and I do not think it does),[13] the error was not harmless.

¶147 For the reasons set forth, I dissent. I, like the court of appeals, would reverse the circuit court's judgment of conviction and order denying postconviction relief and would remand the cause for further proceedings.

¶148 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[13] The court determined that harmless error review applies to the denial of a defendant's constitutional right to testify in Anthony, 2015 WI 20, ¶¶11, 96, 101, and Nelson, 355 Wis. 2d 722, ¶43. I dissented in both cases, concluding that harmless error review does not apply when a defendant is unconstitutionally deprived of the fundamental right to testify. See Anthony, 2015 WI 20, ¶140 (Abrahamson, C.J., dissenting); Nelson, 355 Wis. 2d 722, ¶79 (Abrahamson, C.J., dissenting). The constitutional right to testify is embedded in the constitutional right to present a defense. See Nelson, 355 Wis. 2d 722, ¶68 (Abrahamson, C.J., dissenting). Accordingly, I conclude that an unconstitutional deprivation of the defendant's right to present a defense is not amenable to harmless error review.